Attorney Grievance Commission v. Michael C. Hodes, Misc. Docket AG No. 61, Sept. Term, 2013, Opinion by Battaglia, J.


**ATTORNEY DISCIPLINE - ATTORNEY MISCONDUCT - DISBARMENT**

The Respondent, Michael Carl Hodes, violated Rules 1.7, 1.15(d), 8.1(a), 8.4(a), (b), (c) and (d) of the Maryland Lawyers' Rules of Professional Conduct and Section 10-306 of the Business Occupations and Professions Article of the Maryland Code. Disbarment is the appropriate sanction when an attorney withdraws $270,000.00 from a deceased client's trust to pay personal debts, withdraws funds from a deceased client's bank account to pay for services not yet performed and testifies falsely under oath during the investigation by Bar Counsel.

Circuit Court for Baltimore County, Maryland
Case No. 03-C-13-012845 OC
Argued: October 7, 2014

IN THE COURT OF APPEALS OF
MARYLAND

Misc. Docket AG No. 61

September Term, 2013

ATTORNEY GRIEVANCE
COMMISSION OF MARYLAND

v.

MICHAEL C. HODES

Barbera, C.J.
Harrell
Battaglia
Greene
Adkins
McDonald
Cathell, Dale R. (Retired,
Specially Assigned)
        JJ.

Opinion by Battaglia, J.

Filed: December 23, 2014

Michael C. Hodes, Respondent, was admitted to the Bar of this Court on December 18, 1975. On October 29, 2013, the Attorney Grievance Commission, ("Petitioner" or "Bar Counsel"), acting pursuant to Maryland Rule 16-751(a),[1] filed a "Petition For Disciplinary or Remedial Action" against Respondent related to his representation of Gloria S. Ominsky. Petitioner alleged that Respondent violated the following Maryland Rules of Professional Conduct ("Rule"): 1.7 (Conflict of Interest: General Rule),[2]

---

[1] Rule 16-751(a) provides, in relevant part:
> (a) **Commencement of disciplinary or remedial action.** (1) *Upon approval or direction of Commission.* Upon approval or direction of the Commission, Bar Counsel shall file a Petition for Disciplinary or Remedial Action in the Court of Appeals.

[2] Rule 1.7 provides:
> (a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a conflict of interest. A conflict of interest exists if:
> (1) the representation of one client will be directly adverse to another client; or
> (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.
> (b) Notwithstanding the existence of a conflict of interest under paragraph (a), a lawyer may represent a client if:
> (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;
> (2) the representation is not prohibited by law;
> (3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and
> (4) each affected client gives informed consent, confirmed in writing.

Rule 1.15(d) (Safekeeping Property),[3] 8.1(a) (Bar Admission and Disciplinary Matters),[4] 8.4(a), (b), (c) and (d) (Misconduct),[5] as well as Section 10-306 of the Business Occupations and Professions Article of the Maryland Code (Misuse of trust money).[6]

In an Order dated November 4, 2013, we referred the matter to Judge Vicki Ballou-Watts of the Circuit Court for Baltimore County for a hearing, pursuant to Maryland Rule

---

[3] Rule 1.15(d) states:
> (d) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall deliver promptly to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall render promptly a full accounting regarding such property.

[4] Rule 8.1(a) provides, in relevant part:
> An applicant for admission or reinstatement to the bar, or a lawyer in connection with a bar admission application or in connection with a disciplinary matter, shall not:
> (a) knowingly make a false statement of material fact;

[5] Rule 8.4 states, in relevant part:
> It is professional misconduct for a lawyer to:
> (a) violate or attempt to violate the Maryland Lawyers' Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;
> (b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;
> (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;
> (d) engage in conduct that is prejudicial to the administration of justice;

[6] Section 10-306 provides:
> A lawyer may not use trust money for any purpose other than the purpose for which the trust money is entrusted to the lawyer.

3

16-757.[7] Respondent was served with the Petition for Disciplinary or Remedial Action, our Order and the Writ of Summons on November 20, 2013, to which Respondent filed a timely response.

Judge Ballou-Watts held evidentiary hearings on March 4, 2014, March 5, 2014 and March 10, 2014. At the hearings, Bar Counsel presented testimony from individuals associated with Respondent's former law firm, Hodes, Pessin and Katz, P.A. (hereinafter

---

[7] Rule 16-757 states:

(a) **Generally.** The hearing of a disciplinary or remedial action is governed by the rules of evidence and procedure applicable to a court trial in a civil action tried in a circuit court. Unless extended by the Court of Appeals, the hearing shall be completed within 120 days after service on the respondent of the order designating a judge. Before the conclusion of the hearing, the judge may permit any complainant to testify, subject to cross-examination, regarding the effect of the alleged misconduct. A respondent attorney may offer, or the judge may inquire regarding, evidence otherwise admissible of any remedial action undertaken relevant to the allegations. Bar Counsel may respond to any evidence of remedial action.
(b) **Burdens of proof.** The petitioner has the burden of proving the averments of the petition by clear and convincing evidence. A respondent who asserts an affirmative defense or a matter of mitigation or extenuation has the burden of proving the defense or matter by a preponderance of the evidence.
(c) **Findings and conclusions.** The judge shall prepare and file or dictate into the record a statement of the judge's findings of fact, including findings as to any evidence regarding remedial action, and conclusions of law. If dictated into the record, the statement shall be promptly transcribed. Unless the time is extended by the Court of Appeals, the written or transcribed statement shall be filed with the clerk responsible for the record no later than 45 days after the conclusion of the hearing. The clerk shall mail a copy of the statement to each party.
(d) **Transcript.** The petitioner shall cause a transcript of the hearing to be prepared and included in the record.
(e) **Transmittal of record.** Unless a different time is ordered by the Court of Appeals, the clerk shall transmit the record to the Court of Appeals within 15 days after the statement of findings and conclusions is filed.

"HPK"), to include Richard "Ricky" Adams, a paralegal, Donna Zurowski, one of Hodes's secretaries, and five attorneys, Kimberly Battaglia,[8] Steven Allen, Kevin Bress, Helen Smith and Drake Zaharris. Hodes testified on his own behalf; he additionally called Lynn Lazzaro, his accountant, LeDonna Berman, a paralegal from his former law firm, Ellen Hodes, his wife, Donna Balanesi, his current secretary, and several character witnesses.

Bar Counsel introduced various documents, which were admitted into evidence, including Gloria S. Ominsky's Last Will and Testament, a Power of Attorney executed by her, an unexecuted Promissory Note, a Promissory Note Guaranty signed by the Respondent, correspondence between Ms. Ominsky and the Respondent, copies of numerous checks and copies of bank account statements. Respondent introduced various documents, which were admitted into evidence, including another copy of Gloria S. Ominsky's Last Will and Testament, a memorandum to the Ominsky file written by Richard Adams, bank account statements and Hodes's resume.

Judge Ballou-Watts issued Findings of Fact and Conclusions of Law in which she found, by clear and convincing evidence, that Respondent violated Rules 1.7, 1.15(d), 8.1(a),[9] 8.4(a), (b), (c) and (d) of the Maryland Lawyers' Rules of Professional Conduct

---

[8] Kim Battaglia is not related to the author of this opinion.

[9] On page 24 of Judge Ballou-Watts's Findings of Fact and Conclusions of Law there is an erroneous reference to Rule 8.1(b), when it is in fact Rule 8.1(a), which is the subsection charged. It is correctly cited on page 3 of the Findings of Fact and Conclusions of Law.

and Section 10-306 of the Business Occupations and Professions Article of the Maryland

Code, all of which had been charged.

Judge Ballou-Watts's Findings of Fact and Conclusions of Law state:[10]

The Respondent was admitted to the Maryland Bar in December 1975. He is a 1975 graduate of the University of Baltimore School of Law. Respondent practiced law at several law firms throughout Maryland until he founded Michael Hodes, P.A. during the late 1980's. He developed a practice concentration in the areas of estates, trusts and what came to be recognized as elder law. Over time, the law firm he founded grew and became known as Hodes, Ulman, Pessin and Katz. Respondent served as Managing Partner of the law firm until 2007. Drake Zaharris succeeded Respondent as the Managing Partner and continues to serve in that capacity. When Attorney Lou Ulman left the practice, the firm was known as Hodes, Pessin and Katz, P.A. (hereinafter "HPK") until Respondent left the firm in May 2012. After his departure from HPK, Respondent established a new Towson-based firm known as "Michael Hodes, LLC."

Respondent has been recognized by several organizations for his skill and experience in the practice areas of elder law, estates and trusts and wealth preservation. He serves as an adjunct law professor at two area law schools and discusses elder law issues during weekly radio broadcasts. Respondent has also been associated with philanthropic efforts for local institutions including his law school alma mater, the University of Baltimore. During the evidentiary hearing, several witnesses testified that they trusted him, valued his advice and appreciated his professional service.

At all relevant times herein, until his departure from the firm in May 2012, Respondent practiced in HPK's "Wealth Preservation" Department. There were three sections within the Wealth Preservation Department, namely, Estate Planning, Probate and Trust Administration and Elder Law.

In 2005, Respondent and HPK began representing Gloria S. Ominsky. Ms. Ominsky sought legal advice in connection with elder care planning and asset preservation related to her sister Elaine Ominsky, who became disabled after a stroke. Both women were unmarried, had no children and no close relatives. They lived together in Pikesville, Maryland in a home inherited from their parents. The law firm helped secure Medicaid coverage for Elaine Ominsky and prepared estate planning documents for both Elaine and Gloria Ominsky. In the early stages of Respondent's Attorney-Client relationship

---

[10] Internal citations to exhibits and testimony are omitted.

with Gloria Ominsky, the value of her asset portfolio was between 1.5 to 2 million dollars.

## Events During 2009-2011

After Gloria Ominsky's health began to decline in 2009, she talked with Respondent about executing a new will to replace the will she executed in 2005. Another HPK attorney prepared a new Last Will and Testament which named Respondent as Personal Representative. The new will also contained certain trust provisions for which Respondent was named as Trustee.

In addition, the law firm prepared a Durable Power of Attorney naming Respondent and another HPK attorney, Kevin Bress, to serve as Gloria Ominsky's attorneys-in-fact, jointly or individually, with regard to her personal care and various financial and property transactions. Although Kevin Bress was named as attorney-in-fact for Gloria Ominsky under the Durable Power of Attorney, he never exercised any authority on her behalf. And, Kevin Bress was never directly involved in the firm's representation of Gloria Ominsky.

The Last Will and Testament and the Durable Power of Attorney were executed by Gloria Ominsky on April 27, 2009.

During the last two years of her life, Gloria Ominsky moved from her home in Pikesville to an assisted living facility in Owings Mills (hereinafter "The Atrium") and later to Levindale Geriatric Center. She developed a relationship of trust with Respondent as her adviser and depended upon him for legal, financial, medical and personal matters. In November 2009, after Gloria Ominsky moved to The Atrium, Respondent's nephew, Brian Gates, moved into the Ominsky home. Although Mr. Gates did not pay rent, he paid the BG&E bills and kept the home secure.

Paralegals in the law firm ran personal errands for Gloria Ominsky, paid bills, coordinated medical appointments and pharmacy needs and provided transportation for medical appointments. Ricky Adams was the HPK paralegal who handled the payment of bills and monitored her financial records. Another HPK paralegal, LeDonna Berman, coordinated medical appointments, pharmacy needs and transportation for medical visits. Gloria Ominsky was aware that the law firm billed her for the aforementioned non-legal work at the HPK paralegal rate of $200.00 to as much as $275.00 per hour. Sometime between 2009 and 2010, Respondent introduced his wife (Ellen Hodes) to Gloria Ominsky. Subsequently, Respondent suggested to Gloria Ominsky that his wife could perform personal errands such as transporting Ms. Ominsky to medical appointments, talking with medical providers and shopping. Ms. Ominsky signed an undated letter on HPK

7

letterhead agreeing to pay for Mrs. Hodes' services at an hourly rate of "$25.00 per hour plus out of pocket expenses" for "day to day tasks" and to "be an advocate with . . . [her] personal and health care concerns and other situations that may arise." Respondent drafted and signed the letter. This arrangement saved money for Ms. Ominsky and provided income for Mrs. Hodes who was not employed.

In 2010, Gloria Ominsky was diagnosed with cancer and began receiving chemotherapy. Because of her declining health, she could no longer drive and Respondent recommended that she sell her Buick LaCrosse. However, Ms. Ominsky did not want to sell her car. Instead, in May 2010, she authorized Respondent to "operate and maintain the vehicle on her behalf and by her direction," according to a file memo prepared by Mr. Adams. Ms. Ominsky also agreed to pay expenses associated with driving her vehicle.

After her health began to decline, Ms. Ominsky's personal checkbook, Wachovia bank statements and all other financial records were kept at the HPK office in a file cabinet near the desk of paralegal Richard Adams. As noted, Mr. Adams was the HPK paralegal responsible for handling the payment of Ms. Ominsky's bills. Whenever bill payment was needed, he followed an established procedure: Mr. Adams would take an invoice (or bill), prepare a check for payment with all sections completed except the date and signature line. Next, he would submit the invoice, an envelope and the prepared check to Respondent for approval and signature. Once Respondent signed the check, Mr. Adams made a copy of the invoice and check for the file. The payment was then mailed.

There was a similar approval process for the payment of Ellen Hodes' time and expenses. Mrs. Hodes submitted a timesheet and any receipts for reimbursements. Mr. Adams prepared a check for payment but submitted Mrs. Hodes' timesheets and receipts to Kim Battaglia, an HPK attorney within the Wealth Preservation Department. Ms. Battaglia would review the timesheet and reconcile the receipts. On repeated occasions, the timesheets included requests for payment at the rate of $30.00 per hour. When this occurred, Ms. Battaglia attached a copy of the agreement for personal services to the timesheet as a reminder that Ms. Ominsky had agreed to pay Mrs. Hodes at the rate of $25.00 per hour. Ms. Battaglia would then return the documentation to Mr. Adams and ask him to submit a corrected check to Respondent for signature with the revised timesheet (and a copy of the personal services agreement) attached. Ms. Battaglia also reviewed the receipts (and Mr. Adams prepared the checks) whenever there was a reimbursement request for LeDonna Berman, Mr. Adams or Respondent. However, she did not have authority to reject the Respondent's reimbursement requests.

On May 14, 2010, Respondent charged two gasoline purchases to his American Express card at a Royal Farms store. One charge was in the amount of $52.15 at 8:48. The second charge, a few minutes later, was in the amount of $28.85. Respondent submitted receipts for these gasoline payments as part of a larger claim for reimbursement. He then issued a check to himself drawn on Ms. Ominsky's personal account that included reimbursement for the May 14, 2010 gas purchases.

On October 31, 2010, at 5:43 p.m., a parking citation was issued to a Lexus vehicle registered to Mrs. Hodes. Mrs. Hodes testified that she was shopping for Ms. Ominsky when she received the citation. Respondent submitted proof of the paid fine for reimbursement. In addition, on January 6, 2011, Respondent was the operator of Ms. Ominsky's car when a traffic citation was issued. However, Respondent issued a check drawn on Ms. Ominsky's personal account to pay the $75.00 fine.

Petitioner contends that Respondent took advantage of his position of trust attained through the attorney-client relationship with Gloria Ominsky when he: 1) received reimbursement for simultaneous gas purchases for his wife's vehicle and Ms. Ominsky's Buick on May 14, 2010; 2) authorized reimbursement to Ellen Hodes for a parking citation she received for her Lexus while shopping at Market Place in Baltimore City on October 31, 2010; and 3) used Ms. Ominsky's personal checking account to pay the $75.00 traffic fine. According to Petitioner, these "expenses were not reasonably related to the care or representation of Ms. Ominsky."

Respondent testified that these expenses, like all others, were reimbursed because they were incurred while he or Mrs. Hodes was engaged in activity on Ms. Ominsky's behalf. Mrs. Hodes testified that she asked Ms. Ominsky about reimbursing the parking citation and that subsequently, she was reimbursed.

In addition, several witnesses testified that even after her health declined, Ms. Ominsky was alert and continued to be actively involved in the review of her expenses. If she objected to the reimbursement of any expenses, there is no evidence of it. As a result, Petitioner has failed to prove by clear and convincing evidence that Respondent obtained unauthorized reimbursements for the gas purchases and parking citation. Petitioner has also failed to meet its burden of proof in connection with the Respondent's payment of the traffic citation from Ms. Ominsky's account.

### Checks Issued From Gloria Ominsky's Wachovia Checking Account in February 2011

Gloria Ominsky entered hospice care at Northwest Hospital during the last one to two weeks of her life. She died on February 20, 2011.

9

In February 2011, Respondent personally issued check number 7416 in the amount of $775.00 made payable to his wife Ellen Hodes. The date on check number 7416 was "2/15/11." However, it did not post as a debit to Ms. Ominsky's Wachovia checking account until March 3, 2011. Respondent personally issued a second check number 7413 in the amount of $14,500.00 made payable to "Michael Hodes Financial," a financial consulting business owned by Respondent. The second check was dated "2/18/11." That check was deposited on February 22, 2011 to an account in the name of "Michael Hodes Financial Consultants."

Petitioner contends that after Ms. Ominsky's death, Respondent removed checks from her personal checkbook, handwrote both checks and backdated them so that it would appear that the checks were issued before her death.

In addition, as to the aforementioned check issued to Michael Hodes Financial ($14,500.00), Petitioner contends that Respondent directed his secretary to create an invoice after Gloria Ominsky's death and to backdate same in an attempt to "legitimize" the payment even though Ms. Ominsky had never entered into a written agreement for financial consulting services or received any itemized bills for same.

Respondent denies the checks were backdated. He also maintains that the $14,500.00 payment to Michael Hodes Financial was for financial consulting services contracted for and rendered.

This Court finds by clear and convincing evidence that Respondent personally issued checks 7416 and 7413 after Gloria Ominsky's death but backdated the checks to make it appear that they were issued before February 20, 2011.

The two checks were not prepared in advance by Mr. Adams, attached to an invoice or reviewed by Ms. Battaglia pursuant to the established HPK procedure. Instead, they were removed from the checkbook and issued by Respondent. In addition, there was no explanation on the memo line for either check. And, there were no timesheets or expense receipts in the Ominsky file to support the check issued to Mrs. Hodes.

It is also interesting to note that the two checks were issued out of order. Check 7413 was dated "2/18/11" and posted as a debit to Ms. Ominsky's Wachovia account on February 23, 2011, while check 7416 was dated "2/11/11" though not posted as a debit to Ms. Ominsky's account until March 3, 2011. Perhaps most telling is the fact that Mr. Adams, who was responsible for keeping Ms. Ominsky's checkbook, reconciling her bank statements and paying her bills, had never seen checks 7413 and 7416 until after HPK began its internal investigation.

In addition, as to check 7413 issued to Michael Hodes Financial in the amount of $14,500.00, this Court is satisfied by clear and convincing

evidence that it was issued after Gloria Ominsky's death to pay monies that Respondent's financial consulting business was not entitled to receive.

Respondent established a separate business entity known as "Michael C. Hodes Financial Consultants, Ltd." (hereinafter "MCH Financial") in the mid-1980's. He testified that clients of MCH Financial were billed either annually or hourly at the rate of $600.00 per hour. Respondent entered into a professional relationship with Ms. Ominsky beginning in 2005. He and HPK provided elder care and estate planning services to Ms. Ominsky which included, *inter alia*, advice on how to protect assets. HPK charged Ms. Ominsky legal fees of almost $200,000.00 for these services. However, Gloria Ominsky never entered into a written agreement with MCH Financial for financial consulting services. And, MCH Financial never issued an itemized statement, invoice or annual bill to Gloria Ominsky at any time prior to her death.

After Ms. Ominsky's death and after check 7413 was posted to the MCH Financial account, Kevin Bress learned of the $14,500.00 check and asked Respondent about it. Respondent advised that the check was payment for financial services rendered. Mr. Bress asked Respondent whether he had an invoice for the services. Respondent did not produce an invoice at that time. However, he then instructed HPK secretary Donna Zurowski to create an invoice from MCH Financial to Gloria Ominsky for "Financial Planning for 2008-2011" in the amount of $14,500.00. The invoice contained no itemization or additional explanation of charges. Although the invoice was dated "January 1, 2011" and addressed to Gloria Ominsky, in care of Respondent, it was not created until March 1, 2011—nine (9) days after her death. Once the invoice was created, Respondent presented the document to Mr. Bress and said, "See, I have an invoice."

During the evidentiary hearing, Respondent offered a second explanation for the $14,500.00 check. He testified that the $14,500.00 check was based on his entitlement to compensation as Ms. Ominsky's Power of Attorney. However, Respondent's alternative explanation for issuing check 7413 as compensation for services rendered as Power of Attorney is not credible. Respondent told Kevin Bress that check 7413 was for financial services rendered. Nothing in the language of the backdated invoice supports this alternative explanation. In addition, if check 7413 was issued as compensation for services as the Power of Attorney, the payee would not have been MCH Financial.

**Estate Probate, The Ominsky Trust and Respondent's Taking and Use of Trust Funds**

11

In March 2011, after Gloria Ominsky's death, Respondent petitioned for probate of the estate with the Register of Wills for Baltimore County. HPK attorney Helen Smith handled the administration of the estate and Respondent was appointed as Personal Representative under the provisions of the will. When the estate inventory was filed, its value was approximately $400,000.00, with the bulk of the estate held in a UBS investment account valued at $352,900.52.

Under the terms of Gloria Ominsky's will, the residuary estate was designated to a testamentary trust with Respondent as Trustee. In the event Elaine Ominsky predeceased Gloria Ominsky (which she did), the will required Respondent to establish and incorporate a tax-exempt charitable foundation known as "The Ominsky Family Charitable Foundation" (hereinafter "Foundation") and to distribute the trust to the Foundation. Under the terms of the will, Respondent would also determine the number of Foundation Board members and serve as Chairman of the Board.

On March 8, 2011, Respondent executed a document entitled an "Organizational Action of the Board of Directors of [the Ominsky Foundation]" in which he appointed himself as President and Treasurer. Respondent appointed his wife, Ellen Hodes, as Vice President and Secretary. No other board members were appointed. And, on March 14, 2011, "The Ominsky Family Charitable Foundation" was incorporated.

On February 8, 2012, the Orphans Court approved the First and Final Administration Account and the estate was closed. Although the bulk of the residuary estate was in the UBS investment account, it was liquidated at Respondent's direction. The funds from the liquidation were deposited into HPK's escrow account. It is important to note that liquidation of the UBS investment account was not necessary. The UBS account could have been passed directly to the testamentary trust and in turn to the Foundation.

On March 8, 2012, Respondent opened a checking account at M&T Bank in the name of "Gloria S. Ominsky Irrevocable Trust" (hereinafter "Ominsky Trust" or "the Trust"). Pursuant to the Trust provisions of the will, Respondent was the Trustee. He was also the only signatory for the Trust bank account.

On March 9, 2012, Respondent directed the issuance of a check drawn on HPK's escrow account in the amount of $375,355.52 and made payable to the "Gloria S. Ominsky Irrevocable Trust." Because of an administrative delay related to the opening of the Trust account, Respondent was unable to deposit the check into the Ominsky Trust account until March 21, 2012.

On March 28, 2012, Respondent issued two (2) checks from the Ominsky Trust account:

Check 5001 - Payable to MCH Financial for $3,500.00;

Check 5002 - Payable to Mikelen Gallery, LLC for $270,000.00.

The check in the amount of $270,000.00 was deposited into the M&T checking account of Mikelen Gallery, LLC (hereinafter "Mikelen") with the word "loan" written on the memo line. Mikelen Gallery, LLC is a business partnership formed by Respondent and his wife, Ellen Hodes, in 2006 for the operation of an art and antiques gallery. Mikelen is not a charitable organization within the meaning of section 501(c)(3) of the Internal Revenue Code.

The next day, on March 29, 2012, Respondent made an "in branch transfer" of $265,000.00 from the Mikelen account to a joint personal account at M&T Bank. The joint personal account was in the name of Respondent and his wife. At the time of the deposit, the joint personal account had a negative balance of $-3,183.74.

After the $265,000.00 deposit, Respondent issued a series of five (5) checks between March 29, 2012 and April 11, 2012. The five (5) checks totaled the sum of $100,317.21. And, the interest rates for the five creditors ranged from the lowest at 13.24% to the highest at 28.24%.

Respondent issued the following checks from his joint personal account:

| Date | Check # | Amount | Payee | Interest Rate |
|------|---------|--------|-------|---------------|
| 3/29/12 | 1581 | $25,010.91 | M&T Bank | 18.00% |
| 3/29/12 | 2097 | $30,227.00 | Bank of America | 15.24% |
| 3/29/12 | 2115 | $4,204.00 | American Express | 13.24% |
| 4/3/12 | 365 | $22,875.30 | Citi Cards | 17.24% |
| 4/11/12 | 2112 | $18,000.00 | Air Tran Visa | 28.24% |

On April 8, 2012, Respondent also issued a check from the same joint personal account to the Weingart Trust in the amount of $161,500.00 to pay the balance of a personal loan he had obtained from a trust managed by his brother-in-law.

In addition, Respondent issued another check (2113) from his joint personal account to the "Laurie Manney Trust" (hereinafter "Manney Trust") in the amount of $1,272.79. Laurie Manney is the Respondent's sister. He made monthly loan payments to her trust pursuant to the terms of a promissory note in his name. At the time of the evidentiary hearing, Respondent testified that the balance on the Manney Trust loan was "about $100,000.00." It is important to note that Respondent did not consult with

13

independent counsel regarding the propriety of the "loan" from the Ominsky Trust at any point prior to or after the transaction.

On April 4, 2012, Respondent instructed his secretary Donna Zurowski to create a new document from his edits of a copy of the Laurie Manney promissory note. The new document was a promissory note which obligated Mikelen Gallery, LLC as "Maker," to repay the aforementioned $270,000.00 "loan" that was made by the Ominsky Trust to Mikelen. Under the terms of the Mikelen Gallery, LLC Promissory Note (hereinafter "Promissory Note"), there would be "interest on the unpaid principal balance from the date of this Note, until paid, at five percent (5%) per annum . . . ." Interestingly, the name of "Michael C. Hodes," which appeared as the Maker on the Manney promissory note was marked out. In its place, Respondent identified the Maker as "Mikelen Gallery, LLC."

Although the draft Promissory Note was given to Ms. Zurowski on April 4, 2012 and edited the same day, Respondent backdated the document to March 30, 2012 to make it appear as though it was prepared contemporaneously with the deposit of $270,000.00 from the Trust to Mikelen Gallery, LLC (and then transferred to Respondent's joint personal account).

In addition, Petitioner contends that although Ms. Zurowski prepared the edited Promissory Note on April 4, 2012 as instructed, it was never executed. According to Petitioner, a separate "Assignment of Promissory Note," (hereinafter "the Assignment") which purports to assign the Ominsky Trust's interest in the Mikelen Promissory Note to the Foundation, was also never executed.

In contrast, Respondent urges the Court to find that he executed both the Promissory Note and the Assignment contemporaneous with the transfer of funds from the Ominsky Trust account to Mikelen Gallery, LLC. In addition, he contends that a loan at 5% interest was beneficial to the Foundation as assignee of the Promissory Note because the rate would give the Foundation a higher return than the then prevailing market interest rates.

Ms. Zurowski, Respondent's legal secretary, scheduled his appointments and performed other administrative work. She was unfamiliar with Gloria Ominsky and had never worked on the Ominsky file. Although Ms. Zurowski typed the Promissory Note as instructed, she was uncomfortable with it and showed the document to Ms. Smith. The conversation between Ms. Zurowski and Ms. Smith triggered a discussion between lawyers in HPK's Wealth Preservation Department, namely attorneys Kevin Bress, Kim Battaglia and Helen Smith. Mr. Bress in turn questioned Respondent about the transaction during an informal meeting in the firm's lounge on April 12, 2012. Ms. Battaglia was present during the meeting. At that point, Mr. Bress and Ms. Battaglia were only aware of the

14

drafted note. Respondent led Mr. Bress and Ms. Battaglia to believe that he had discussed the potential loan with his Certified Public Accountant Lynn Lazzaro and that the firm would not be involved. However, the information eventually made its way to the firm's managing partner, Drake Zaharris.

On April 25, 2012, Ms. Smith took Respondent's shadow file for Gloria Ominsky to Mr. Zaharris. She advised Mr. Zaharris that she was concerned about the possibility that Respondent may have taken money from the Ominsky trust and loaned it to himself or Mikelen Gallery, LLC. Mr. Zaharris reviewed the law firm's Ominsky files, discovered the unexecuted Promissory Note and Assignment, saw the check register, confirmed the deposit of the $270,000.00 check and initiated a further internal investigation. He never saw an executed version of the Promissory Note or the Assignment.

Ultimately, HPK retained outside counsel and Mr. Zaharris called an emergency meeting with the firm's equity members on Sunday, April 29, 2012. At the time of the emergency meeting, Respondent was in Seattle at a conference. During a meeting break, Mr. Allen, Mr. Zaharris and outside counsel placed a telephone call to Respondent. Respondent was placed on speaker phone. Mr. Allen took the lead in the conversation and asked Respondent whether he took the money from the Trust. Respondent acknowledged that he had taken the money to pay personal bills and admitted that he did not have the funds to repay it. When Respondent was asked if he signed the Promissory Note, he did not respond. Mr. Allen encouraged Respondent to retain counsel, told him that members of the firm were upset and advised him that he would need to leave the firm.

In a subsequent dinner meeting, Respondent told Mr. Allen that he executed the Promissory Note and that Ms. Zurowski witnessed the signing. Mr. Allen again told Respondent that HPK members were upset and that he would have to leave the firm. He also told Respondent that the firm would negotiate a fair separation agreement.

The Court finds by clear and convincing evidence that the Promissory Note and the Assignment were created after Respondent issued checks 5001 and 5002 from the Ominsky Trust account and after Respondent transferred $265,000.00 from Mikelen Gallery, LLC to his joint personal account. The Court also finds that Respondent never executed the Promissory Note or the Assignment. Mr. Zaharris reviewed the firm's Ominsky files as part of an internal investigation and no copies of the Promissory Note and Assignment were ever found. In addition, Respondent was unable to produce a copy of the Promissory Note and Assignment he claimed to have signed. And, Donna Zurowski testified that she never saw Respondent sign the note. Although Mr. Adams testified that he had seen the executed version of the Promissory Note, during redirect examination he was unable to recall any details about

15

an executed Note. As a result, the Court finds that Mr. Adams was simply mistaken when he testified about having seen the executed Promissory Note.

### Respondent's Restitution of $270,000.00 to the Foundation

After a series of negotiations regarding the terms of his separation from HPK, Respondent received a compensation package which included three checks totaling $216,000.00 made payable to him on the condition that said monies would be used to repay $270,000.00 to the Foundation. Restitution of the $270,000.00 transferred by Respondent from the Ominsky Trust account to his Mikelen Gallery, LLC account was repaid in May 2012.

On May 18, 2012, HPK reported the aforementioned matters to Bar Counsel.

### Respondent's Statement Under Oath and Production of Purported Promissory Note Guaranty

On December 12, 2012, during Bar Counsel's investigation, Respondent provided a statement under oath, pursuant to MD. CODE ANN. § 16-732.[11] At the time of his statement, Respondent testified that on March 28, 2012, he prepared and executed a Promissory Note Guaranty (hereinafter "Guaranty") in order to personally guarantee the payment of the Mikelen Promissory Note. According to Respondent, he does not recall who typed the Guaranty, but it was not typed by anyone at the firm. A copy of the purported Guaranty was faxed to Respondent's counsel and Bar Counsel on December 18, 2012.

Petitioner contends that the "Guaranty" was not created until after Bar Counsel began its investigation and questioned why Respondent was not personally liable as the maker of the Promissory Note since the $270,000.00 was for personal use.

The Court finds by clear and convincing evidence that Respondent testified falsely regarding the creation and execution of the Guaranty. The Guaranty was purportedly created at the same time as the Promissory Note and Assignment, yet witnesses testified that it did not resemble any forms typically used by HPK attorneys and staff. In addition, no one at the firm ever saw the purported Guaranty nor was it found in any of the law firm's Ominsky files. Most significant is the fact that the first time Respondent mentioned the existence of a Guaranty was after Bar Counsel began its investigation. It is also important to note that the purported Guaranty could not have been created on March 28, 2012 because Donna Zurowski did not

---

[11] This citation is intended to reference Maryland Rule 16-732.

16

type the Promissory Note until April 4, 2012. In other words, Respondent could not have guaranteed an obligation before it existed.

**Check 5001 in the Amount of $3,500.00 Issued to MCH Financial**

Lastly, the Petitioner contends that the check issued to MCH Financial from the Ominsky Trust account in the amount of $3,500.00 was an unearned payment and this Court agrees. Similar to the check Respondent issued to MCH Financial in the amount of $14,500.00 after Ms. Ominsky's death, there was no itemization, contract or invoice to support the $3,500.00 payment. In fact, Respondent admitted that he did not know why the check was issued but said, "it would probably have been for financial planning going forward."

## III. CONCLUSIONS OF LAW

The Petitioner has the burden of proving the alleged violations by clear and convincing evidence. MD. CODE ANN. 16-757(b).[12]

This Court has applied the appropriate standard and makes the following conclusions of law by clear and convincing evidence:

**RULE 1.7: CONFLICT OF INTEREST- GENERAL RULE**

**(a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involved a conflict of interest. A conflict of interest exists if:**

(1) the representation of one client will be directly adverse to another client; or

**(2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.**

(b) Notwithstanding the existence of a conflict of interest under paragraph (a), a lawyer may represent a client if:

---

[12] This citation is intended to reference Maryland Rule 16-757(b).

(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

(2) the representation is not prohibited by law;

(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

(4) each affected client gives informed consent, confirmed in writing.

MD. RULES OF PROF'L CONDUCT R. 1.7 (emphasis added).

This Court finds by clear and convincing evidence that Respondent violated Maryland Rule of Professional Conduct 1.7 because his actions in connection with his own personal interests had an adverse impact on his duty of loyalty to Ms. Ominsky and the Ominsky Trust. Those actions materially limited his representation of her interests and the interest of the Trust beneficiaries.

Respondent was obligated as an attorney and a fiduciary to protect Ms. Ominsky's interests and assets even after her death. He served as her attorney from 2005 up until her death. Under the terms of her will, he was appointed as Personal Representative of her Estate, Trustee of her Testamentary Trust and Chairman of the Board for The Ominsky Family Charitable Trust Foundation.

"Conflicts of interest impair the trustee's ability to act on behalf of the beneficiaries with independent and disinterested judgment in the administration of the trust, the rationale being that it is generally not possible for the same person to act fairly in two capacities and on behalf of two interests in the same transaction." *Attorney Grievance Comm'n of Maryland v. Sachse*, 345 Md. 578, 588, 693 A.2d 806, 811 (1997) (quoting George G. Bogert, The Law of Trusts and Trustees § 543 (2d ed. rev. 1993)).

Immediately upon her death from cancer, Respondent acted in his own self-interest by issuing checks to his wife ($775.00) and to his consulting business known as MCH Financial ($14,500.00) and backdated those checks with full knowledge that neither payee was entitled to payment. Respondent then failed in his transparent attempt to hide the fact that his consulting business was not entitled to the check for $14,500.00 by instructing his secretary to create an invoice for services, address the invoice to Gloria Ominsky and backdate same to a date before her death.

18

Respondent also violated Rule 1.7 in his capacity as Trustee of the Ominsky Trust when he engaged in self-dealing to the detriment of the Trust beneficiary and removed $270,000.00 from the Ominsky Trust account so that he could pay personal debts. He also acted in his own self-interest and to the detriment of the Trust beneficiaries when he issued a check to his financial consulting business for an unearned fee in the amount of $3,500.00.

"Perhaps the most fundamental duty of a trustee is that he must display throughout the administration of the trust complete loyalty to the interest of the beneficiar[ies] and must exclude all selfish interest and all consideration of the interests of third persons." *Sachse*, 345 Md. at 588, 693 A.2d at 811 (quoting Bogert, *supra* § 541).

## RULE 1.15: SAFEKEEPING PROPERTY

\* \* \* \*

(d) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall deliver promptly to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall render promptly a full accounting regarding such property.

MD. RULES OF PROF'L CONDUCT R. 1.15.

This court finds by clear and convincing evidence that Respondent violated Maryland Rule of Professional Conduct 1.15. Under the terms of Gloria Ominsky's Last Will and Testament, the residuary estate was to be held in trust. Respondent, as Trustee, was obligated to distribute the Trust funds to a charitable foundation known as The Ominsky Family Charitable Foundation as directed by the provisions of her will.

Once the First and Final Administration Account was approved and the estate was closed, Respondent unnecessarily liquidated the UBS investment account funds and deposited those funds into the firm's escrow account. He then opened a checking account at M&T Bank in the name of Gloria S. Ominsky Irrevocable Trust and deposited $375,355.52 into the Trust account. However, instead of promptly delivering the Trust funds to the Foundation, Respondent removed $270,000.00 for his own benefit to facilitate the payment of personal debts. He also removed an additional $3,500.00 for the benefit of a financial consulting company he owned.

## RULE 8.1: BAR ADMISSION AND DISCIPLINARY MATTERS

19

An applicant for admission or reinstatement to the bar, or a lawyer in connection with a bar admission application **or in connection with a disciplinary matter**, shall not:

([a]) knowingly make a false statement of material fact

MD. RULES OF PROF'L CONDUCT R. 8.1. (emphasis added).

This Court finds by clear and convincing evidence that Respondent violated Maryland Rule of Professional Conduct 8.1 because Respondent testified falsely during his statement under oath on December 12, 2012. Bar Counsel initiated an investigation into Respondent's reported activities including the removal of $270,000.00 from the Trust account for use in paying personal debts. Respondent has consistently characterized the removal of those funds as a "loan." To buttress this claim, Respondent gave a statement under oath pursuant to the Maryland Code Annotated Section 16-732 and testified that on March 28, 2012 he executed a personal Guaranty for the repayment of the aforementioned $270,000.00. MD. CODE ANN. § 16-732.[13]

For the reasons set forth in this Court's Findings of Fact, the Court finds that Respondent knowingly made a false statement about the existence and execution of a personal Guaranty to repay the $270,000.00 during the investigation by Bar Counsel.

## RULE 8.4: MISCONDUCT

It is professional misconduct for a lawyer to:

(a) violate or attempt to violate the Maryland Lawyers' Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

(d) engage in conduct that is prejudicial to the administration of justice.

MD. RULES OF PROF'L CONDUCT R. 8.4.

---

[13] This citation is intended to reference Maryland Rule 16-732.

This Court finds by clear and convincing evidence that Respondent violated Maryland Rule of Professional Conduct 8.4(a) because Respondent violated the Maryland Rules of Professional Conduct as described in these Conclusions of Law.

Under Rule 8.4(b), it is professional misconduct for a lawyer to commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects.

Although Respondent has not been prosecuted for a violation of the Maryland Code, Criminal Law Article Section 7-113(a), Embezzlement-Fraudulent misappropriation by fiduciaries, this Court concludes by clear and convincing evidence that his strategic removal of $270,000.00 from the Ominsky Trust while serving as Trustee was a knowing and willful violation which reflects adversely on a lawyer's honesty, trustworthiness and fitness as a lawyer. MD. CODE ANN., CRIM. LAW § 7113(a) ("A fiduciary may not: (1) fraudulently and willfully appropriate money or a thing of value that the fiduciary holds in a fiduciary capacity contrary to the requirements of the fiduciary's trust responsibility; or (2) secrete money or a thing of value that the fiduciary holds in a fiduciary capacity with a fraudulent intent to use the money or thing of value contrary to the requirements of the fiduciary's trust responsibility.").

Respondent violated Rule 8.4(c) because his conduct in: 1) issuing checks to his wife and his consulting business without following the system of checks and balances established by the law firm; 2) backdating those checks to make it appear that they were issued before Ms. Ominsky's death; 3) creating an invoice, *post hoc*, for monies his consulting business was not entitled to; and 4) instructing his secretary to backdate the invoice to a date before Ms. Ominsky's death, can only be described as dishonest and fraudulent.

Similarly, Respondent's removal of $270,000.00 from the Ominsky Trust to his business account for Mikelen Gallery, LLC and immediate "in branch" transfer of $265,000.00 from the Mikelen account to a joint personal bank account, held with his wife, in order to pay personal debts, was dishonest and fraudulent. Respondent unsuccessfully attempted to hide the fact that the entire series of aforementioned transactions was designed to hide his true goal—to inconspicuously use trust funds to pay personal debts. He was not entitled to "loan" $270,000.00 or any other monies from the Trust to himself. However, if he had truly intended to "borrow" funds from the Trust, he would have sought approval from independent counsel and executed a promissory note in his own name at the time the funds were removed.

Instead, Respondent engaged in a ruse with other members of the law firm and Bar Counsel (and this Court) about a Promissory Note on behalf of Mikelen Gallery, LLC, an Assignment in favor of the Foundation and a

personal "Guaranty." As a result, this Court finds that Respondent violated Rule 8.4(c).

## Rule 8.4(d)

This Court also finds by clear and convincing evidence that Respondent violated Rule 8.4(d). Respondent's conduct, as described under Rules 8.4(a), (b) and (c) is prejudicial to the administration of justice because he took trust funds in his capacity as an attorney and fiduciary and used them to pay personal debts. His conduct is also harmful to the legal profession because it undermines the public's confidence that an attorney will exercise his fiduciary duties in protecting funds entrusted to his professional care and responsibility.

## MARYLAND BUSINESS OCCUPATIONS AND PROFESSIONS ANNOTATED CODE § 10-306: MISUSE OF TRUST MONEY

A lawyer may not use trust money for any purpose other than the purpose for which the trust money is entrusted to the lawyer.

MD. CODE ANN., BUS. OCC. & PROF. § 10-306.

This Court finds by clear and convincing evidence that Respondent violated Maryland Business Occupations and Professions Article Section 10-306 because Respondent used the Ominsky Trust funds to pay personal debts when he was obligated to protect those funds as Trustee and transfer them promptly to the Foundation.

## IV. MITIGATION

The Respondent has the burden of proving matters of mitigation or extenuation by a preponderance of the evidence. MD. CODE ANN. § 16-757.[14]

This Court finds Respondent has established by a preponderance of the evidence that:

1. Respondent has never been disciplined or sanctioned by the Court since his admission to the Maryland Bar on December 18, 1975.

2. Respondent made restitution to the Foundation in the amount of $270,000.00 in May 2012. While it is true that HPK required payment of restitution as a condition of the Separation Agreement, three checks issued to Respondent by the law firm

---

[14] This citation is intended to reference Maryland Rule 16-757.

totaling $216,000.00 were endorsed to the Foundation. Respondent contributed $54,000.00 and paid the Foundation with a check drawn on his personal account.

3. Respondent has been recognized by several organizations for his skill and experience in the practice areas of elder law, estates and trusts and wealth preservation. He serves as an adjunct law professor at two area law schools and discusses elder law issues during weekly radio broadcasts. Respondent has also been associated with philanthropic efforts for local institutions including his law school alma mater, the University of Baltimore. During the evidentiary hearing, several witnesses testified that they trusted him, valued his advice and appreciated his professional service.

Yet, with all of his knowledge and experience in the practice areas of elder law and estates and trusts, Respondent displayed a remarkable lack of insight into his professional responsibility as an attorney and fiduciary. He continued to insist that he had taken a "loan" of $270,000.00 from the Trust in order to pay personal bills, as if this form of self-dealing was acceptable.

In addition, Respondent showed no remorse for his actions. Instead, he complained that he was subjected to a "star chamber" investigation by his former law firm and claimed that members of the firm reported his activity to Bar Counsel in an effort to "steal" his practice and "make him look like a crook."

## V. EXTENUATING CIRCUMSTANCES

Respondent has failed to offer any evidence of compelling extenuating circumstances. *Attorney Grievance Comm'n v. Vanderline*, 364 Md. 376, 773 A.2d 463 (2001).

## VI. SUMMARY

The Court finds by clear and convincing evidence that Respondent violated Maryland Rules of Professional Conduct 1.7, 1.15, 8.1 and 8.4 and also violated Maryland Business Occupations and Professions Section 10-306. MD. RULES OF PROF'L CONDUCT R.'S 1.7, 1.15, 8.1, 8.4; MD. CODE ANN., BUS. OCC. & PROF. § 10-306.

(internal footnotes omitted).

23

On October 7, 2014, we entered a *per curiam* order disbarring Respondent. *Attorney Grievance v. Hodes*, 440 Md. 186, 101 A.3d 441 (2014). Accordingly, we now shall explain our reasons.

### I. Standard of Review

"'This Court has original and complete jurisdiction over attorney discipline proceedings in Maryland.'" *Attorney Grievance v. O'Leary*, 433 Md. 2, 28, 69 A.3d 1121, 1136 (2013), quoting *Attorney Grievance v. Chapman*, 430 Md. 238, 273, 60 A.3d 25, 46 (2013). We conduct an independent review of the record and we accept the hearing judge's findings of fact unless shown to be clearly erroneous. *Attorney Grievance v. Lara*, 418 Md. 355, 364, 14 A.3d 650, 656 (2011). "Under our independent review of the record, we must determine whether the findings of the hearing judge are based on clear and convincing evidence."[15] *Attorney Grievance v. Mooney*, 359 Md. 56, 73, 753 A.2d 17, 26 (2000). With

---

[15] We have explained the clear and convincing evidence standard as follows:

> The requirement of "clear and convincing" or "satisfactory" evidence does not call for "unanswerable" or "conclusive" evidence. The quality of proof, to be clear and convincing, has also been said to be somewhere between the rule in ordinary civil cases and the requirement of criminal procedure—that is, it must be more than a mere preponderance but not beyond a reasonable doubt. It has also been said that the term "clear and convincing" evidence means that the witnesses to a fact must be found to be credible, and that the facts to which they have testified are distinctly remembered and the details thereof narrated exactly and in due order, so as to enable the trier of the facts to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue. Whether evidence is clear and convincing requires weighing, comparing, testing, and judging its worth when considered in connection with all the facts and circumstances in evidence.

*Attorney Grievance v. Mooney*, 359 Md. 56, 79, 753 A.2d 17, 29 (2000), quoting *Berkey v. Delia*, 287 Md. 302, 320, 413 A.2d 170, 178 (1980).

respect to exceptions, upon our review of the record, "the hearing judge's findings of fact generally will be accepted unless they are clearly erroneous." *Attorney Grievance v. Whitehead*, 405 Md. 240, 253, 950 A.2d 798, 806 (2008), citing Rule 16-759(b)(2). "A hearing judge's factual finding is not clearly erroneous if there is any competent material evidence to support it." *Attorney Grievance v. McDonald*, 437 Md. 1, 16, 85 A.3d 117, 125 (2014) (internal quotation omitted). As to the hearing judge's conclusions of law, such as whether provisions of the Maryland Rules of Professional Conduct were violated, our consideration is *de novo*. Rule 16-759(b)(1).

Bar Counsel has not filed any exceptions to Judge Ballou-Watts's findings of fact and conclusions of law. Respondent has filed exceptions, in which he challenges various findings of fact and numerous conclusions of law.

## II. Respondent's Exceptions to Findings of Fact

Respondent initially argues that he was not acting in the role of an attorney when he was operating as an attorney-in-fact or as the Trustee of the Gloria S. Ominsky Irrevocable Trust (hereinafter "Ominsky Trust" or "the Trust"), and claims, therefore, that the Rules of Professional Conduct and Section 10-306 of the Business Occupations and Professions Article of the Maryland Code do not apply.

The Maryland Rules of Professional Conduct govern Maryland attorneys' conduct and ethical obligations. Rule 8.5(a)(1) states: "A lawyer admitted by the Court of Appeals to practice in this State is subject to the disciplinary authority of this State, regardless of where the lawyer's conduct occurs." Rule 8.5(a)(1) identifies Maryland Rule 16-701(a) as

25

a cross-reference, which defines "attorney" as: "a person admitted by the Court of Appeals to practice law in this State."

Section 10-306 of the Business Occupations and Professions Article of the Maryland Code states: "A lawyer may not use trust money for any purpose other than the purpose for which the trust money is entrusted to the lawyer." In Section 10-101(g) of the Business Occupations and Professions Article of the Maryland Code, "lawyer" is defined as: "an individual who is admitted to the Bar."

Clearly, Respondent was an attorney in 2011 and 2012, when the acts in question occurred. He was admitted to the Bar of this Court in December of 1975 and continued his licensure through the time of his misconduct.

Respondent, however, argues that, even though he was licensed, he was not acting within an attorney-client relationship and was, instead, acting in a personal or non-legal capacity as either an attorney-in-fact or the Trustee of the Ominsky Trust.

This Court recently opined about the parameters of the attorney-client relationship in *Attorney Grievance v. Shoup*, 410 Md. 462, 489-90, 979 A.2d 120, 135-36 (2009):

> As an initial matter, we acknowledge that determining "what constitutes an attorney-client relationship is a rather elusive concept." *Attorney Grievance Comm'n v. Shaw*, 354 Md. 636, 650, 732 A.2d 876, 883 (1999) (quoting *Folly Farms I, Inc. v. Trustees*, 282 Md. 659, 670, 387 A.2d 248, 254 (1978)). The facts and circumstances of each particular case are critical in determining whether an attorney-client relationship exists. *See Shaw*, 354 Md. at 650–51, 732 A.2d at 883. A key factor that courts look to is whether the purported "client" sought legal advice. *E.I. du Pont de Nemours & Co. v. Forma–Pack, Inc.*, 351 Md. 396, 421, 718 A.2d 1129, 1141 (1998). Certainly, an attorney-client relationship still can be found even though the attorney renders services or advice that is not strictly legal in character. *See, e.g., Page v. Penrose*, 147 Md. 225, 227–28, 127 A. 748, 749

26

(1925). Moreover, a personal relationship or close friendship with a purported "client" does not preclude a court from finding that an attorney-client relationship exists. *Attorney Grievance Comm'n v. Brooke*, 374 Md. 155, 175, 821 A.2d 414, 425 (2003). Our cases make clear that an explicit agreement or payment arrangement is not a prerequisite to the formation of an attorney-client relationship. *Attorney Grievance Comm'n v. James*, 355 Md. 465, 476–77, 735 A.2d 1027, 1033 (1999) (quoting *Central Cab Co. v. Clarke*, 259 Md. 542, 549–50, 270 A.2d 662, 666 (1970)).

Here, Hodes asserts that his various roles were personal or non-legal in nature with respect to the assets of Ms. Ominsky and, therefore, he should not be subject to the imposition of the Rules of Professional Conduct. Even were we to accept Hodes's characterization that he was acting in a personal or non-legal role when he acted as an attorney-in-fact or as the Trustee of the Ominsky Trust, however, his actions would still be subject to the Rules.

Insofar as personal or non-legal conduct is concerned, we have recognized, as Hodes argues, that a finding made by the hearing judge that an attorney-client relationship did not exist, indeed, could eliminate the possibility of an attorney facing disciplinary action. In *Shoup*, 410 Md. at 468-71, 979 A.2d at 123-25, Shoup was charged with violations of Rules 1.1, 1.4(a) and (b), 1.7(b), 1.8(a), 1.15(a), (b) and (c), and 8.4(a), (c) and (d), Section 10-306 of the Business Occupations and Professions Article of the Maryland Code and Maryland Rule 16-609,[16] which is a regulation of attorney trust accounts outside of the

---

[16] Rule 16-609 states, in relevant part:
(a) **Generally**. An attorney or law firm may not borrow or pledge any funds required by the Rules in this Chapter to be deposited in an attorney trust account, obtain any remuneration from the financial institution for depositing any funds in the account, or use any funds for any unauthorized purpose.

disciplinary rules, arising from a real estate investment he made on behalf of a woman who the hearing judge characterized as his "girlfriend." The hearing judge specifically found that no attorney-client relationship existed between Shoup and his "girlfriend" based on the testimony of Shoup's "girlfriend" that they had a romantic relationship and she never intended Shoup provide her with legal services. The hearing judge also found that Shoup's conduct was not dishonest or fraudulent nor prejudicial to the administration of justice. This Court, although determining ultimately that Shoup violated Rule 16-609, upheld the hearing judge's findings that a personal relationship, rather than one of attorney-client, existed and his acts were not dishonest, deceitful, fraudulent, nor so criminal or egregious that the harm to his paramour was patent.

We also have recognized that an attorney acting in a personal capacity was not subject to discipline when the hearing judge found that the attorney's conduct was not so "extreme that it inherently harms the administration of justice." *Attorney Grievance v. Harris*, 403 Md. 142, 154, 939 A.2d 732, 739 (2008). In *Harris*, we upheld the hearing judge's finding that Harris was acting solely on his own behalf when Harris requested an investment fund, jointly owned by his ex-wife's estate and himself, to be transferred into his sole ownership. The hearing judge found that Harris "did not show good faith, and was certainly dishonest," but "[t]he type of dishonesty that was present in this case does not necessarily prejudice the administration of justice." *Id.* at 155, 939 A.2d at 739-40. We upheld these findings. However, we did impose discipline in the case, even though Harris acted in a personal capacity, because he made a knowing misrepresentation to the

28

employees of the investment fund company that he had sole ownership of the fund, when, in fact, ownership had been converted to a tenancy in common by operation of law after his divorce from his ex-wife.

As *Harris* suggests, we have imposed discipline in situations in which the attorney was acting in a personal capacity, such as when the hearing judge had found that the attorney's conduct was in "direct contravention" to his obligations as a lawyer and the attorney was aware his actions would thwart a criminal investigation. *See Attorney Grievance v. Sheinbein*, 372 Md. 224, 239, 812 A.2d 981, 989-90 (2002). In *Sheinbein*, the hearing judge found that Sheinbein aided his son in fleeing to Israel after his son had committed murder. The hearing judge found that Sheinbein "had the commensurate requisite intent to obstruct or hinder" the police investigation and that "that respondent's sending his son to Israel in spite of the knowledge that his son was an 'integral party to a criminal investigation" was "'in direct contravention to the oath he swore in open court when he was admitted to the Bar of the Court of Appeals of Maryland on June 24, 1971.'" *Id.* at 239, 245, 812 A.2d at 990, 993. The hearing judge's findings supported our determination that Sheinbein's "utter abandonment of proper professional conduct in the face of the circumstances of [the victim's] murder leads this Court to only one conclusion: that respondent is no longer fit to practice law." *Id.* at 261, 812 A.2d at 1002.

We have declined to further extend the purview of the Rules when the attorney was acting in a non-legal capacity. In *Attorney Grievance v. Link*, 380 Md. 405, 428-29, 844 A.2d 1197, 1211 (2004), this Court upheld the hearing judge's finding that Link had

engaged in "rude, boorish, insensitive, oppressive and certainly insulting" behavior, when he became involved in a heated argument with an MVA employee in circumstances where it was not apparent that he was representing a client. This Court determined that Link's conduct was not criminal "nor conduct of the kind that the harm or potential harm flowing from it is patent," and, thus, was not subject to the Rules. *Id.* at 429, 844 A.2d at 1212.

In contradistinction, we have determined that attorneys, acting in a non-legal role, are subject to the purview of the Rules when the hearing judge has found that the attorney's conduct was dishonest, fraudulent, deceitful or constituted a misrepresentation. In *Attorney Grievance Comm'n v. Lazerow*, 320 Md. 507, 578 A.2d 779 (1990), a non-practicing attorney, who was acting in a non-legal capacity, was involved in the building and renting of houses. While acting in that capacity, Lazerow took over $200,000.00 of purchasers' down payments, which are statutorily required to be held in escrow accounts, to pay the bills of his home building enterprises. The hearing judge found, and we agreed, that Lazerow's conduct, while "'not for the furtherance of any immediate personal financial gains . . . clearly show[ed] an intent to mislead (i.e., fraudulent intent).'" *Id.* at 512, 578 A.2d at 781.

More recently, in *Attorney Grievance v. Seltzer*, 424 Md. 94, 34 A.3d 498 (2011), an attorney, who was a managing partner of several realty companies, engaged in deceitful and fraudulent conduct arising out of his attempted purchase of commercial real estate. We determined that Seltzer was subject to the Rules when the hearing judge found that Seltzer's conduct in misappropriating funds from his real estate company's escrow account

was deceitful, constituted the crime of theft and was prejudicial to the administration of justice. The hearing judge found Seltzer's "continuing course of deceit for nine (9) months was prejudicial to the administration of justice" when he created fraudulent documents to induce a seller to enter into a contract with him, misrepresented his role in his real estate company and misappropriated funds from his real estate company. *Id.* at 106, 34 A.3d at 506. The hearing judge also found Seltzer's conduct was deceitful and constituted theft when Seltzer withdrew money from his real estate company's operating account "and converted those funds for his own use without entitlement." *Id.* at 110, 34 A.3d at 508. We emphasized that merely because Seltzer "engaged in deceitful conduct outside of the practice of law does not immunize the sanctionable nature of his behavior." *Id.* at 114, 34 A.3d at 510.

We have recognized, in this vein, the "fundamental requirements" of a lawyer are honesty, integrity and respect for the legal system. *See Attorney Grievance Comm'n v. Milliken*, 348 Md. 486, 520, 704 A.2d 1225, 1241 (1998). When an attorney manifests dishonest, deceitful or fraudulent conduct in a personal or non-legal capacity, the lawyer brings into question whether he or she possesses the requisite character to practice law and to justify the trust and confidence necessary to interact with clients, the public and the legal system. Charles W. Wolfram, Modern Legal Ethics § 3.1 (1986) ("Misconduct by a licensed lawyer suggests that unless discipline is imposed, the lawyer might use the shield of the license to induce trust in prospective clients, courts, and other lawyers and thereby gain the opportunity to harm members of the public."); *see also* Restatement (Third) of the

Law Governing Lawyers § 5 cmt.6 (2000) ("Professional duties defined in lawyer codes are mainly concerned with lawyer functions performed by a lawyer in the course of representing a client and causing harm to the client, to a legal institution such as a court, or to a third person. Those duties extend further, however, and include some lawyer acts that, even if not directly involving the practice of law, draw into question the ability or willingness of the lawyer to abide by professional responsibilities."); *Maryland State Bar Ass'n, Inc. v. Agnew*, 271 Md. 543, 550, 318 A.2d 811, 815 (1974) ("If a lawyer elects to become a business man, he brings to his merchantry the professional requirements of honesty, uprightness, and fair dealing. Equally, a lawyer who enters public life does not leave behind the canons of legal ethics.")

Therefore, even were Hodes to have been operating in a personal or a non-legal capacity when he was in the role of an attorney-in-fact or as a Trustee when he removed $14,500.00 and $775.00 from Ms. Ominsky's personal account and $270,000.00 and $3,500.00 from the Trust account, he was found by the hearing judge to have acted dishonestly and fraudulently. With respect to the $270,000.00, Judge Ballou-Watts determined, additionally, that his conduct constituted the crime of embezzlement under Section 7-113(a) of the Criminal Law Article of the Maryland Code (2013).

Hodes, nevertheless, was not found by the hearing judge to have been acting in a personal or non-legal capacity, as an attorney-in-fact or as a Trustee. Rather, Hodes was found to have had an attorney-client relationship with Ms. Ominsky, which did not terminate. Judge Ballou-Watts found that Ms. Ominsky developed a "relationship of trust

32

with Respondent as her adviser and depended upon him for legal, financial, medical and personal matters." It was from this attorney-client relationship that Hodes's roles of attorney-in-fact and Trustee emanated.

Respondent, in the instant case, was operating under authority given to him by Ms. Ominsky's Power of Attorney when he withdrew $14,500.00 and $775.00 from her personal account. Judge Ballou-Watts found, among other facts, that:

> After Gloria Ominsky's health began to decline in 2009, she talked with Respondent about executing a new will to replace the will she executed in 2005. Another HPK attorney prepared a new Last Will and Testament which named Respondent as Personal Representative. The new will also contained certain trust provisions for which Respondent was named as Trustee.
>
> In addition, the law firm prepared a Durable Power of Attorney naming Respondent and another HPK attorney, Kevin Bress, to serve as Gloria Ominsky's attorneys-in-fact, jointly or individually, with regard to her personal care and various financial and property transactions. Although Kevin Bress was named as attorney-in-fact for Gloria Ominsky under the Durable Power of Attorney, he never exercised any authority on her behalf. And, Kevin Bress was never directly involved in the firm's representation of Gloria Ominsky.
>
> The Last Will and Testament and the Durable Power of Attorney were executed by Gloria Ominsky on April 27, 2009.
>
> \*\*\*
>
> After her health began to decline, Ms. Ominsky's personal checkbook, Wachovia bank statements and all other financial records were kept at the HPK office in a file cabinet near the desk of paralegal Richard Adams.

With respect to issuance of the $14,500.00 and $775.00 checks, Judge Ballou-Watts found, specifically:

> Gloria Ominsky entered hospice care at Northwest Hospital during the last one to two weeks of her life. She died on February 20, 2011.
>
> In February 2011, Respondent personally issued check number 7416 in the amount of $775.00 made payable to his wife Ellen Hodes. The date on

33

check number 7416 was "2/15/11." However, it did not post as a debit to Ms. Ominsky's Wachovia checking account until March 3, 2011. Respondent personally issued a second check number 7413 in the amount of $14,500.00 made payable to "Michael Hodes Financial," a financial consulting business owned by Respondent. The second check was dated "2/18/11." That check was deposited on February 22, 2011 to an account in the name of "Michael Hodes Financial Consultants."

Respondent's access to Ms. Ominsky's personal checking account funds was as a result of his acting under the Power of Attorney executed by Ms. Ominsky when Hodes was her lawyer.

With respect to Hodes's conduct when he was acting as a Trustee of the Ominsky Trust, Judge Ballou-Watts found:

> Another HPK attorney prepared a new Last Will and Testament which named Respondent as Personal Representative. The new will also contained certain trust provisions for which Respondent was named as Trustee.
> ***
> Under the terms of Gloria Ominsky's will, the residuary estate was designated to a testamentary trust with Respondent as Trustee. In the event Elaine Ominsky predeceased Gloria Ominsky (which she did), the will required Respondent to establish and incorporate a tax-exempt charitable foundation known as "The Ominsky Family Charitable Foundation" (hereinafter "Foundation") and to distribute the trust to the Foundation. Under the terms of the will, Respondent would also determine the number of Foundation Board members and serve as Chairman of the Board.
> ***
> On March 8, 2012, Respondent opened a checking account at M&T Bank in the name of "Gloria S. Ominsky Irrevocable Trust" (hereinafter "Ominsky Trust" or "the Trust"). Pursuant to the Trust provisions of the will, Respondent was the Trustee. He was also the only signatory for the Trust bank account.

Ms. Ominsky's Last Will and Testament was drafted by a member of Respondent's firm and included a provision that created a testamentary trust with the Respondent designated

as the Trustee. Respondent's role as Trustee emanated directly out of his attorney-client relationship with Ms. Ominsky.

Similar circumstances arose in *Attorney Grievance Comm'n v. Owrutsky*, 322 Md. 334, 347, 587 A.2d 511, 517 (1991), where the hearing judge found that Owrutsky was an attorney for Joseph and Ella Peigert and violated the Rules of Professional Conduct when he loaned himself money from a testamentary trust created by Joseph Peigert's will:

> On August 17, 1981, the respondent withdrew $48,370.82 from a passbook account at Second National entitled "Owrutsky and Drake, attorneys for Robert Peigert Trust" and deposited those funds into his escrow account. On August 18, 1981, a $40,000 check was drawn on those trust funds in the respondent's escrow account to the order of Gerald and Bette Patt. The $40,000 escrow check was redeposited the same day to the respondent's escrow account as funds of Gerald and Bette Patt. The same day two $20,000 checks were then drawn on those funds in the escrow account, one to the order of Bette Patt and one to the order of Owrutsky and Drake, P.A., the respondent's law firm. The $20,000 escrow check to Owrutsky and Drake, P.A. was deposited into the law firm's general account and on that same day, August 18, 1981, respondent drew a $20,000 check to himself from the firm's general account. The balance in the respondent's firm's general account at the time of the $20,000 deposit was $5,034.14. The respondent signed all of the checks in this transaction, and was fully aware that he was obtaining $20,000 from the trust funds. A demand note to the Robert Peigert trust for $40,000 was signed by Bette and Gerald Patt. Bette Patt was the respondent's employee since 1969 and a close friend. The loan to Gerald and Bette Patt was made without the knowledge or consent of Doris McMahon, co-trustee, and was unsecured.

The hearing judge further found "that part of the loan to Bette Patt was, in fact, a loan to the respondent from trust funds, which was improper" and concluded that it constituted a violation of the disciplinary rules. *Id.* We agreed, and noted that the loan "involve[d] a violation of the duty of loyalty owed by a fiduciary" and that it "is a breach of trust for a trustee to lend trust funds to himself." *Id.* at 351, 587 A.2d at 519. We stated that, "'[t]his

35

is true, even though by the terms of the trust [the trustee] is given the widest powers of investment.'" *Id.* at 351, 586 A.2d at 519, quoting 2A Scott, *The Law of Trusts* § 170.17. We opined that, "'Even where the trustee is authorized to make such investments as in his absolute and uncontrolled discretion he may see fit, however, it has been held that he cannot properly lend trust funds to himself personally.'" *Id.*, quoting 3A Scott, *supra* § 227.14.

*Owrutsky* demonstrates that we have disciplined an attorney for his conduct when that conduct emanated from an attorney-client relationship. Here, like *Owrutsky*, Respondent had an attorney-client relationship with Ms. Ominsky that began in 2005, which facilitated all of his actions on her behalf, such as attorney-in-fact and as Trustee. Hodes breached his fiduciary duty as an attorney-in-fact and as a Trustee, capacities which he acted in pursuant to Ms. Ominsky's Power of Attorney and Will.

Respondent also excepts to the hearing judge's failure to find facts that he had included in his post-hearing Proposed Findings of Fact. Specifically, he had offered that he had engaged in certain philanthropic and charitable activities; that Respondent and Ms. Ominsky had a close, familial, relationship; what the average compensation is for attorneys-in-fact; that the Power of Attorney executed by Gloria Ominsky was still in effect to authorize him to make a $14,500.00 payment to himself; that the interest rate of the loan of $270,000.00 was at an above-market rate; that Respondent had no history of defaulting on loan payments; that members of the firm were aware that Mikelen Gallery was owned by Respondent and his wife; that the removal of $270,000.00 was a loan, and not a "so-called 'loan'"; that Respondent treated the transaction as a loan and Mr. Adams began the

loan documentation process as early as March 8, 2012; that Lynn Lazzarro, CPA, was told about the $270,000.00 and asked to create an amortization schedule; that Respondent made no effort to disguise the existence of the $270,000.00 withdrawal; and that Respondent cooperated with both Pessin Katz Law P.A., the successor to HPK, and with Bar Counsel in their respective investigations.

We overrule Respondent's numerous exceptions regarding the proposed facts he submitted, because the hearing judge is not required to accept all or any of Bar Counsel or Respondent's proposed findings:

> A judge hearing an attorney grievance matter does not need to meld together his or her own opinion, taking bits and pieces of each party's proposed findings of facts and conclusions of law, but may adopt one party's filing in its entirety, as long as it accurately reflects the judge's independent factual findings, proven by clear and convincing evidence at the hearing, and the legal conclusions flowing therefrom.

*Attorney Grievance v. Joseph*, 422 Md. 670, 696, 31 A.3d 137, 153 (2011). Judge Ballou-Watts made independent findings, established by clear and convincing evidence, based upon her evaluation of what she heard and saw after three days of evidentiary hearings.

At the heart of the rest of Respondent's voluminous exceptions are four transactions. Respondent issued two checks from Ms. Ominsky's personal Wachovia bank account, which he had access to because of his role as her attorney-in-fact: check 7416 for $775.00 to his wife, Ellen Hodes, and check 7413 for $14,500.00 to his financial consulting company, Michael Carl Hodes Financial (hereinafter "MCH Financial"). Hodes, additionally, issued two checks from the Ominsky Trust bank account at M&T Bank, while acting in his capacity as Trustee of the Ominsky Trust: check 5001 for $3,500.00 to MCH

Financial, and check 5002 for $270,000.00 to Mikelen Gallery, LLC. After depositing the $270,000.00 check into the Mikelen Gallery account, Respondent transferred $265,000.00 from the Mikelen Gallery account to his personal joint checking account.

In developing her factual findings, the hearing judge discredited much of Respondent's testimony regarding his explanation of his writing of the four checks and his testimony regarding the creation and execution of a Promissory Note, Assignment of the Promissory Note and a Guaranty for his withdrawal of $270,000.00 from the Ominsky Trust account.

Hodes argues that Judge Ballou-Watts improperly discredited his testimony when he testified that he issued the $14,500.00 check from Ms. Ominsky's personal account as remuneration to him for his services rendered as Ms. Ominsky's attorney-in-fact; when he testified that he had a conversation with his accountant, Lynn Lazzaro, with respect to the $270,000.00 he took from the Ominsky Trust account; when he testified that he executed the Promissory Note; and when he recounted that he did not testify falsely on December 12, 2012, during his statement under oath pursuant to Maryland Rule 16-732,[17] when he

---

[17] Rule 16-732 states, in relevant part:
  (a) **Approval and issuance.**
  (1) The Chair of the Commission may authorize Bar Counsel to issue a subpoena to compel the attendance of witnesses and the production of designated documents or other tangible things at a time and place specified in the subpoena if the Chair finds that (A) the subpoena is necessary to and in furtherance of an investigation being conducted by Bar Counsel pursuant to Rule 16-731 or (B) the subpoena has been requested by a disciplinary authority of another jurisdiction pursuant to the law of that jurisdiction for
(continued . . .)

38

stated to Bar Counsel that he had executed a personal Guaranty for the $270,000.00 withdrawal.

We generally "defer to the credibility findings of the hearing judge." *Attorney Grievance v. Agbaje*, 438 Md. 695, 722, 93 A.3d 262, 277 (2014). "'The hearing judge is in the best position to evaluate the credibility of the witnesses and to decide which one to believe and, as we have said, to pick and choose which evidence to rely upon.'" *Attorney Grievance v. DiCicco*, 369 Md. 662, 683-84, 802 A.2d 1014, 1026 (2002), quoting *Attorney Grievance v. Monfried*, 368 Md. 373, 390, 794 A.2d 92, 101 (2002); *see also Attorney Grievance v. Sheridan*, 357 Md. 1, 17, 741 A.2d 1143, 1152 (1999) (stating that the hearing judge is "in the best position to assess first hand a witness's credibility"). As we have stated, a hearing judge is "free to disregard the testimony of respondent if the judge believed the evidence was not credible." *Monfried*, 368 Md. at 390, 794 A.2d at 101. Judge Ballou-Watts's credibility determinations are within her discretion and, accordingly, we overrule Respondent's exceptions related to the hearing judge's credibility determinations.

Embedded also in practically all of his exceptions is Hodes's assertion that the hearing judge relied on evidence and testimony that was not material nor probative and,

---

(. . . continued)
use in a disciplinary or remedial proceeding in that jurisdiction to determine alleged professional misconduct or incapacity of a lawyer subject to the jurisdiction of that disciplinary authority.
(2) Upon approval, Bar Counsel may issue the subpoena.
                                    ***
(g) **Recording of statements.** Everything said by the witness at the time and place specified in the subpoena shall be contemporaneously recorded stenographically or electronically, and the witness shall be placed under oath.

therefore, not relevant. Among his challenges, Respondent claims that it was not relevant that the $14,500.00 and $775.00 checks were not issued pursuant to the typical HPK firm procedure; that Mr. Adams did not see the $14,500.00 check or the $775.00 check until after HPK began its internal investigation; that there was a lack of explanation in the memo line of both checks; that there was a lack of timesheets or expense reports in the Ominsky file to support the $775.00 check; that the Promissory Note was not signed; that the unexecuted Promissory Note and the Assignment of the Note were created after the $270,000.00 withdrawal from the Ominsky Trust corpus; and that the document entitled "Promissory Note Guaranty" was created after the Promissory Note and Assignment of the Note were drafted. A hearing judge, however, has broad discretion to determine evidence's relevance when considering its admission. *Ruffin Hotel Corp. of Maryland v. Gasper*, 418 Md. 594, 619, 17 A.3d 676, 691 (2011) ("It is frequently stated that the issue of whether a particular item of evidence should be admitted or excluded is committed to the considerable and sound discretion of the trial court . . . .") (internal citation omitted). Judge Ballou-Watts appropriately exercised her discretion in her determination of both probative value and materiality.

We now turn to Respondent's specific factual exceptions:

Respondent excepts to the factual finding that he improperly issued two checks, one for $775.00 to his wife, Ellen Hodes, and another for $14,500.00 to his financial consulting company, MCH Financial, from Ms. Ominsky's personal Wachovia bank account. Judge Ballou-Watts found that both the $14,500.00 and the $775.00 check were issued after Ms.

40

Ominsky's death, that Respondent had backdated the two checks to appear as though they were issued prior to death and that both payments were unearned:

> Immediately upon [Ms. Ominsky's] death from cancer, Respondent acted in his own self-interest by issuing checks to his wife ($775.00) and to his consulting business known as MCH Financial ($14,500.00) and backdated those checks with full knowledge that neither payee was entitled to payment.

Hodes argues, initially, that the hearing judge's findings that he improperly issued the $14,500.00 and $775.00 checks were not based on clear and convincing evidence, because, he alleges, that the hearing judge wrongly relied on the wavering testimony of Kimberly Battaglia, an attorney at HPK, regarding the date the checks were issued. Ms. Battaglia's testimony, however, established unequivocally and consistently that she first saw the checks for $14,500.00 and $775.00 after Ms. Ominsky had died. We, accordingly, overrule this exception.

Respondent also argues that the hearing judge relied on the evidence that the $14,500.00 and $775.00 checks were not issued pursuant to the typical HPK firm procedure, which he claims does not demonstrate when the checks were issued or if they were backdated. Judge Ballou-Watts found that the HPK approval procedure for payments of Ms. Ominsky's bills, according to the testimony of Richard Adams, a former HPK paralegal, included:

> Whenever bill payment was needed, [Mr. Adams] followed an established procedure: Mr. Adams would take an invoice (or bill), prepare a check for payment with all sections completed except the date and signature line. Next, he would submit the invoice, an envelope and the prepared check to Respondent for approval and signature. Once Respondent signed the check,

41

Mr. Adams made a copy of the invoice and check for the file. The payment was then mailed.

Judge Ballou-Watts found, also, that the HPK approval procedure for payments to Ellen Hodes, according to the testimony of Mr. Adams and Ms. Battaglia, entailed:

> There was a similar approval process for the payment of Ellen Hodes' time and expenses. Mrs. Hodes submitted a timesheet and any receipts for reimbursements. Mr. Adams prepared a check for payment but submitted Mrs. Hodes' timesheets and receipts to Kim Battaglia, an HPK attorney within the Wealth Preservation Department. Ms. Battaglia would review the timesheet and reconcile the receipts.

Judge Ballou-Watts identified these omissions as significant. She found, specifically, that:

> The two checks were not prepared in advance by Mr. Adams, attached to an invoice or reviewed by Ms. Battaglia pursuant to the established HPK procedure. Instead, they were removed from the checkbook and issued by Respondent. In addition, there was no explanation on the memo line for either check. And, there were no timesheets or expense receipts in the Ominsky file to support the check issued to Mrs. Hodes.
> It is also interesting to note that the two checks were issued out of order. Check 7413 was dated "2/18/11" and posted as a debit to Ms. Ominsky's Wachovia account on February 23, 2011, while check 7416 was dated "2/11/11" though not posted as a debit to Ms. Ominsky's account until March 3, 2011. Perhaps most telling is the fact that Mr. Adams, who was responsible for keeping Ms. Ominsky's checkbook, reconciling her bank statements and paying her bills, had never seen checks 7413 and 7416 until after HPK began its internal investigation.

The omissions in the observance of the HPK procedures demonstrate Respondent's deliberate attempt to circumvent controls established by the law firm to limit defalcation and we, therefore, overrule this exception.

Respondent also argues that when the hearing judge made her factual findings she erroneously relied on the fact that there was no explanation in the memo line of both checks and that there were no timesheets nor expense receipts in the Ominsky file to support the

42

$775.00 check payment to Ellen Hodes. As we have often stated, "it is elementary that the hearing judge 'may elect to pick and choose which evidence to rely upon.'" *Sheridan*, 357 Md. at 17, 741 A.2d at 1152, quoting *Attorney Grievance Comm'n v. Kemp*, 303 Md. 664, 675, 496 A.2d 672, 677 (1985). Judge Ballou-Watts's reliance on this evidence was within her discretion and we overrule this exception.

Respondent also takes issue with Judge Ballou-Watts's finding that the checks were issued out of order and posted after Ms. Ominsky's death. Judge Ballou-Watts recognized that "Check 7413 was dated '2/18/11' and posted as a debit to Ms. Ominsky's Wachovia account on February 23, 2011, while check 7416 was dated '2/11/11' though not posted as a debit to Ms. Ominsky's account until March 3, 2011." Judge Ballou-Watts's determination regarding the order of the issuance of the checks is significant, because it highlights Respondent's dishonest conduct when viewed in the totality of Respondent's other actions, such as that he did not follow the protocol established by HPK in issuing the checks and he backdated the checks. Again, these findings were based on clear and convincing evidence and supported by the record and we, therefore, overrule this exception.

Respondent's next four exceptions relate only to the $14,500.00 check issued from Ms. Ominsky's personal Wachovia account made payable to Respondent's financial consulting firm, MCH Financial. Hodes had access to Ms. Ominsky's personal account pursuant to the Power of Attorney given to him by Ms. Ominsky.

43

Respondent next excepts to the hearing judge's finding that, "Gloria Ominsky never entered into a written agreement with MCH Financial for financial consulting services. And, MCH Financial never issued an itemized statement, invoice or annual bill to Gloria Ominsky at any time prior to her death" in support of the $14,500.00 payment to MCH Financial. Judge Ballou-Watts found, additionally, that Respondent had "full knowledge" that MCH Financial was not entitled to payment and was created after Ms. Ominsky's death:

> [Respondent] then instructed HPK secretary Donna Zurowski to create an invoice from MCH Financial to Gloria Ominsky for "Financial Planning for 2008-2011" in the amount of $14,500.00. The invoice contained no itemization or additional explanation of charges. Although the invoice was dated "January 1, 2011" and addressed to Gloria Ominsky, in care of Respondent, it was not created until March 1, 2011—nine (9) days after her death.

Respondent argues that Bar Counsel offered no proof that MCH Financial had not earned the $14,500.00 and that the hearing judge's finding that the check was unearned was not based on clear and convincing evidence. To the contrary, however, Judge Ballou-Watts's findings were based on clear and convincing evidence that Hodes failed to produce any written agreement or itemized invoice between MCH Financial and Ms. Ominsky for the $14,500.00. There was no proof, additionally, of any oral agreement between MCH Financial and Ms. Ominsky adduced during the evidentiary hearings. An exhibit introduced during the hearings was a Microsoft Word detailed properties record for the invoice, which recorded when the document was created and edited. The properties record indicated the

44

document was not created until March 1, 2011. Ms. Zurowski also testified that she created the document in March of 2011. We, accordingly, overrule this exception.

Respondent also claims that Judge Ballou-Watts incorrectly inferred that he acted fraudulently as a result of his producing the MCH Financial invoice for $14,500.00 after Ms. Ominsky's death, as she found that, "creating an invoice, *post hoc*, for monies his consulting business was not entitled to . . . can only be described as dishonest and fraudulent."

We have recognized that the finding that an attorney "engaged in conduct involving dishonesty, fraud, deceit or misrepresentation [is] within the province of the hearing judge, to be decided after consideration of character testimony and other evidence presented . . . ." *Attorney Grievance v. Thomas*, 409 Md. 121, 156, 973 A.2d 185, 206 (2009). We have opined, also, that "[a]n attorney's intent . . . may be inferred from circumstantial evidence." *Attorney Grievance v. Jarosinski*, 411 Md. 432, 452, 983 A.2d 477, 489 (2009). "Moreover, in making the determination that an attorney's misconduct was willful, the hearing judge may choose the evidence upon which to rely and, as long as the record supports the corresponding finding, we will not disturb the hearing judge's decision." *Id.*

There was clear and convincing evidence to support that the $14,500.00 invoice was a product of fraudulent conduct, because it was created after the death of Ms. Ominsky, did not reflect any itemization, and there was no proof adduced at the evidentiary hearings of any written or oral agreement between MCH Financial and Ms. Ominsky. Judge Ballou-Watts also based her determination that Respondent harbored fraudulent intent upon

45

Respondent's other conduct, such as that he did not follow the protocol established by HPK in issuing the check, he backdated the check and he instructed his secretary to backdate the invoice. We overrule this exception.

Respondent excepts to Judge Ballou-Watts's finding that the $14,500.00 was not a payment for his services as Ms. Ominsky's attorney-in-fact, pursuant to the Power of Attorney. Judge Ballou-Watts found:

> Respondent told Kevin Bress that check 7413 was for financial services rendered. Nothing in the language of the backdated invoice supports this alternative explanation. In addition, if check 7413 was issued as compensation for services as the Power of Attorney, the payee would not have been MCH Financial.

The basis for this finding was Kevin Bress's testimony that, when he met with Hodes, Hodes stated that the invoice was for financial services rendered by MCH Financial, rather than claiming it was payment for him acting as Ms. Ominsky's attorney-in-fact, and then later provided Mr. Bress with the purported invoice between MCH Financial and Ms. Ominsky. We, therefore, overrule this exception.

Respondent then excepts to the inference of fraudulent intent drawn by Judge Ballou-Watts from Hodes's explanation that the $14,500.00 check was to pay him for his services as an attorney-in-fact, as well as the fact that MCH Financial was the payee of the $14,000.00 check, rather than Hodes. Certainly, the inference drawn by the hearing judge was one within her discretion, especially because neither explanation of the $14,500.00 check was supported by the record. *See Jarosinski*, 411 Md. at 452, 983 A.2d at 489. We overrule this exception.

46

With regard to the $270,000.00 check that Hodes wrote from the Ominsky Trust's corpus while he was a Trustee, Respondent first excepts to the hearing judge's finding that "Respondent led Mr. Bress and Ms. Battaglia to believe that he had discussed the potential loan with his Certified Public Accountant Lynn Lazzaro and that the firm would not be involved." Hodes excepts to the use of the words "led to believe", because he infers a malignant purpose by use of the phrase. Both Mr. Bress and Ms. Battaglia testified that they were told by the Respondent that he had discussed the potential loan with Lynn Lazzaro and not to be concerned with the file as it was no longer with the firm. Judge Ballou-Watts's finding was based on clear and convincing evidence and we, therefore, overrule this exception.

Respondent also excepts to the hearing judge's finding that he never executed a Promissory Note between Mikelen Gallery and the Ominsky Trust to repay the Trust for the $270,000.00 he removed from the Trust account. The hearing judge found:

> On April 4, 2012, Respondent instructed his secretary Donna Zurowski to create a new document from his edits of a copy of the Laurie Manney promissory note. The new document was a promissory note which obligated Mikelen Gallery, LLC as "Maker," to repay the aforementioned $270,000.00 "loan" that was made by the Ominsky Trust to Mikelen. Under the terms of the Mikelen Gallery, LLC Promissory Note (hereinafter "Promissory Note"), there would be "interest on the unpaid principal balance from the date of this Note, until paid, at five percent (5%) per annum . . . ." Interestingly, the name of "Michael C. Hodes," which appeared as the Maker on the Manney promissory note was marked out. In its place, Respondent identified the Maker as "Mikelen Gallery, LLC."
>
> Although the draft promissory note was given to Ms. Zurowski on April 4, 2012 and edited the same day, Respondent backdated the document to March 30, 2012 to make it appear as though it was prepared contemporaneously with the deposit of $270,000.00 from the Trust to

Mikelen Gallery, LLC (and then transferred to Respondent's joint personal account).

*\*\*\**

The Court also finds that Respondent never executed the Promissory Note or the Assignment. Mr. Zaharris reviewed the firm's Ominsky files as part of an internal investigation and no copies of the promissory Note and Assignment were ever found. In addition, Respondent was unable to produce a copy of the Promissory Note and Assignment he claimed to have signed. And, Donna Zurowski testified that she never saw Respondent sign the note. Although Mr. Adams testified that he had seen the executed version of the Promissory Note, during redirect examination he was unable to recall any details about an executed Note. As a result, the Court finds that Mr. Adams was simply mistaken when he testified about having seen the executed Promissory Note.

This finding is based on clear and convincing evidence: Mr. Zaharris testified that during the investigation initiated by the law firm he did not see any executed Promissory Note in the Ominsky file; Ms. Zurowski testified that she never saw Respondent sign the Promissory Note; and Respondent never produced a copy of an executed Promissory Note. We, accordingly, overrule this exception.

Respondent next excepts to Judge Ballou-Watts's finding that his creation of the Promissory Note and the Assignment of the Note, which allegedly assigned the Ominsky Trust's interest in the $270,000.00 Promissory Note to the Ominsky Family Charity Foundation, occurred after he withdrew the $270,000.00 from the Ominsky Trust, as well as her finding of fraudulent intent. Judge Ballou-Watts found:

The Court finds by clear and convincing evidence that the Promissory Note and the Assignment were created after Respondent issued checks 5001 [for $3,500.00] and 5002 [for $270,000.00] from the Ominsky Trust account and after Respondent transferred $265,000.00 from Mikelen Gallery, LLC to his joint personal account.

*\*\*\**

48

Similarly, Respondent's removal of $270,000.00 from the Ominsky Trust to his business account for Mikelen Gallery, LLC and immediate "in branch" transfer of $265,000.00 from the Mikelen account to a joint personal bank account, held with his wife, in order to pay personal debts, was dishonest and fraudulent. Respondent unsuccessfully attempted to hide the fact that the entire series of aforementioned transactions was designed to hide his true goal—to inconspicuously use trust funds to pay personal debts. He was not entitled to "loan" $270,000.00 or any other monies from the Trust to himself. However, if he had truly intended to "borrow" funds from the Trust, he would have sought approval from independent counsel and executed a promissory note in his own name at the time the funds were removed.

Instead, Respondent engaged in a ruse with other members of the law firm and Bar Counsel (and this Court) about a Promissory Note on behalf of Mikelen Gallery, LLC, an Assignment in favor of the Foundation and a personal "Guaranty."

There is clear and convincing evidence that Hodes created the Promissory Note and Assignment of the Note after his removal of the $270,000.00 from the Trust account on March 28, 2012. Ms. Zurowski testified that she created the Promissory Note on April 4, 2012. The record shows that the document is backdated to March 30, 2012. The Assignment of the Note is dated April 30, 2012. Judge Ballou-Watts is entitled to infer Respondent's intent from circumstantial evidence. *See Jarosinski*, 411 Md. at 452, 983 A.2d at 489. We overrule this exception.

Respondent excepts to the hearing judge's finding that he "testified falsely regarding the creation and execution of the Guaranty" in his statement under oath, provided to Bar Counsel pursuant to Rule 16-732. Specifically, Judge Ballou-Watts found that:

On December 12, 2012, during Bar Counsel's investigation, Respondent provided a statement under oath, pursuant to MD. CODE ANN. § 16-732.[18] At the time of his statement, Respondent testified that on March 28, 2012, he prepared and executed a Promissory Note Guaranty (hereinafter

---

[18] This citation is intended to reference Maryland Rule 16-732.

49

"Guaranty") in order to personally guarantee the payment of the Mikelen Promissory Note. According to Respondent, he does not recall who typed the Guaranty, but it was not typed by anyone at the firm. A copy of the purported Guaranty was faxed to Respondent's counsel and Bar Counsel on December 18, 2012.

***

The Court finds by clear and convincing evidence that Respondent testified falsely regarding the creation and execution of the Guaranty. The Guaranty was purportedly created at the same time as the Promissory Note and Assignment, yet witnesses testified that it did not resemble any forms typically used by HPK attorneys and staff. In addition, no one at the firm ever saw the purported Guaranty nor was it found in any of the law firm's Ominsky files. Most significant is the fact that the first time Respondent mentioned the existence of a Guaranty was after Bar Counsel began its investigation. It is also important to note that the purported Guaranty could not have been created on March 28, 2012 because Donna Zurowski did not type the Promissory Note until April 4, 2012. In other words, Respondent could not have guaranteed an obligation before it existed.

Judge Ballou-Watts's finding is based on clear and convincing evidence: Mr. Adams testified that he had never seen the Promissory Note Guaranty, had never seen a Guaranty at HPK in that format and had never seen Respondent use a cut and paste method to create documents; Ms. Battaglia testified that she had never seen the Guaranty prior to the investigation, had never seen a Guaranty at HPK in that format, had never seen the Respondent use a cut and paste method to create documents and had never seen Respondent use a photocopier to create documents with that method; Ms. Zurowski testified that she had never seen the Guaranty before, had never seen a Guaranty at HPK in that format and had never observed Respondent use a cut and paste method to create documents. Judge Ballou-Watts's finding was also based on the fact that Respondent did not mention the existence of the Guaranty until he gave his Rule 16-732 statement. All of this evidence supports the finding that the Guaranty was created after Bar Counsel's investigation had

begun and that Respondent testified falsely that the Guaranty existed prior to the investigation. We, therefore, overrule this exception.

Respondent next excepts to the hearing judge's finding that "there was no itemization, contract or invoice to support the $3,500.00" check Respondent issued from the Ominsky Trust account and that, therefore, the payment was unearned. Respondent argues that the $3,500.00 was an advance payment to MCH Financial for services not yet rendered and, thereby, concedes that the payment was not earned at the time the check was issued. In addition, Judge Ballou-Watts's finding was based on the lack of a written agreement between Ms. Ominsky and MCH Financial, as well as the lack of records of the financial services rendered or to be rendered in the future. Respondent failed to produce any contract or invoice for the $3,500.00 between Ms. Ominsky and MCH Financial. Judge Ballou-Watts's finding is, therefore, supported by clear and convincing evidence and we overrule this exception.

Having overruled all Respondent's exceptions to the hearing judge's findings of fact, and having determined that the findings are supported by clear and convincing evidence in the record, we now turn to Respondent's numerous exceptions to Judge Ballou-Watts's conclusions of law.

### III. Respondent's Exceptions to Conclusions of Law

Respondent first excepts to the conclusion that he violated Rule 1.7. Rule 1.7, entitled "Conflict of Interest: General Rule", provides, in relevant part, that an attorney "shall not represent a client if . . . there is a significant risk that representation of one or

51

more clients will be materially limited by . . . a personal interest of the lawyer." Hodes argues that Ms. Ominsky was not his client when he removed $14,500.00 and $775.00 from her personal checking account and, thus, Rule 1.7 is inapplicable. This assertion, of course, flies in the face of Hodes's representation that the $14,500.00 and $775.00 checks were actually issued prior to Ms. Ominsky's death under the Power of Attorney.

The hearing judge, however, concluded that Hodes violated Rule 1.7:

> This Court finds by clear and convincing evidence that Respondent violated Maryland Rule of Professional Conduct 1.7 because his actions in connection with his own personal interests had an adverse impact on his duty of loyalty to Ms. Ominsky and the Ominsky Trust. Those actions materially limited his representation of her interests and the interest of the Trust beneficiaries.
>
> ***
>
> Immediately upon [Ms. Ominsky's] death from cancer, Respondent acted in his own self-interest by issuing checks to his wife ($775.00) and to his consulting business known as MCH Financial ($14,500.00) and backdated those checks with full knowledge that neither payee was entitled to payment. Respondent then failed in his transparent attempt to hide the fact that his consulting business was not entitled to the check for $14,500.00 by instructing his secretary to create an invoice for services, address the invoice to Gloria Ominsky and backdate same to a date before her death.

Unlike what Hodes asserts, our Rule 1.7, in contrast to the ABA Model Rule 1.7 ("Conflict of Interest: Current Clients"), does not require that the client be a "current client", nor does it require a "concurrent" conflict of interest, nor does it require that there is an immediacy to the existence of the representation. *See* Model Rules of Prof'l Conduct R. 1.7 (2013). We considered incorporating the ABA Model Rule 1.7 language of "current" and "concurrent" when we adopted the current Rule 1.7 in 2005, but we declined to add those terms. 32:5 *Maryland Register* 539-42 (Mar. 4, 2005). As a result, the factual

52

predicates were met for Hodes's conduct to constitute a violation of Rule 1.7 whether he was found to have withdrawn the $14,500.00 and $775.00 from Ms. Ominsky's personal account before or after her death.

Judge Ballou-Watts found, moreover, that Respondent violated Rule 1.7 when he engaged in self-dealing by transferring $270,000.00 from the Trust account into his own account to pay personal debts and by issuing a check for $3,500.00 from the Trust account payable to MCH Financial. She reasoned:

> Respondent also violated Rule 1.7 in his capacity as Trustee of the Ominsky Trust when he engaged in self-dealing to the detriment of the Trust beneficiary and removed $270,000.00 from the Ominsky Trust account so that he could pay personal debts. He also acted in his own self-interest and to the detriment of the Trust beneficiaries when he issued a check to his financial consulting business for an unearned fee in the amount of $3,500.00.
> "Perhaps the most fundamental duty of a trustee is that he must display throughout the administration of the trust complete loyalty to the interest of the beneficiar[ies] and must exclude all selfish interest and all consideration of the interests of third persons." *Sachse*, 345 Md. at 588, 693 A.2d at 811 (quoting Bogert, *supra* § 541).

A trustee has a duty to "act solely in the interest of the trust." *Attorney Grievance Comm'n v. Sachse*, 345 Md. 578, 591, 693 A.2d 806, 813 (1997). As we emphasized in *Sachse*:

> In the management of a trust, a trustee is charged with exercising "the care, skill, prudence, and diligence of an ordinary prudent [person] engaged in similar business affairs and with objectives similar to those of the trust in question." *Maryland Nat'l Bank v. Cummins*, 322 Md. 570, 580, 588 A.2d 1205, 1210 (1991). "All trustees are subject to common law duties and equitable rules or principles." George G. Bogert, *The Law of Trusts and Trustees* § 541 (2d ed. rev. 1993). "Perhaps the most fundamental duty of a trustee is that he must display throughout the administration of the trust complete loyalty to the interests of the beneficiar[ies] and must exclude all selfish interest and all consideration of the interests of third persons." *Id.* § 543; *see also Board of Trustees v. Mayor of Baltimore*, 317 Md. 72, 109, 562 A.2d 720, 738 (1989) ("[T]he general duty of loyalty is well-established in

Maryland law."), *cert. denied*, 493 U.S. 1093, 110 S.Ct. 1167, 107 L.Ed.2d 1069 (1990). "[A] trustee is charged by law with representing the beneficiaries' interests," *Board of Trustees*, 317 Md. at 90, 562 A.2d at 728, and is liable for acting to their detriment when the conduct causing the loss "failed to conform to the standard of care and skill applicable to trustees in the administration of the trusts," Bogert, *supra* § 541. "It is clear that the trustee's duty of loyalty extends beyond a prohibition against self-dealing and conflict of interest . . . . Even if the trustee has no personal stake in a transaction, the duty of loyalty bars him from acting in the interest of third parties at the expense of the beneficiaries." *Board of Trustees*, 317 Md. at 109, 562 A.2d at 738. Conflicts of interest impair the trustee's ability to act on behalf of the beneficiaries with independent and disinterested judgment in the administration of the trust, the rationale being that it is generally not possible for the same person to act fairly in two capacities and on behalf of two interests in the same transaction. Bogert, *supra* § 543.

*Id.* at 588, 693 A.2d at 811.

In another fiduciary scenario, *Attorney Grievance v. Ruddy*, 411 Md. 30, 981 A.2d 637 (2009), we determined that Ruddy violated Rule 1.7 when, acting as his aunt's personal representative, he failed to make arrangements to obtain interest payments on a loan he had taken from his aunt prior to her death, because there were estate beneficiaries who would have benefitted from his payment of interest.

Hodes argues, however, that *Ruddy* gives him support, because, he asserts, the case stands for the proposition that a fiduciary is permitted to make a loan to himself under Rule 1.7. In actuality, *Ruddy* does not support that conclusion. After Ruddy drafted a will for his aunt, he borrowed $95,000.00 from her, which was to be repaid after her death. Ruddy and his wife, thereafter, signed a promissory note to repay the loan without interest within one hundred twenty (120) days after his aunt's death without any further interest provisions. Ruddy's aunt died and Ruddy was appointed as Personal Representative of his aunt's

estate. Upon preparing the inventory of the estate, Ruddy realized the note was already in default, because 120 days had passed. Ruddy paid the $95,000.00 loan out of his legacy from the estate, but failed to make any arrangements to obtain interest payments and referred to the loan as non-interest bearing in his inventory of the estate.

We did not discipline Ruddy for having taken a loan from his aunt, but did determine his actions constituted a conflict of interest with respect to the collection of interest for the loan, because he should have made provisions for payment of interest after 120 days. We emphasized that "there were over thirty other interested parties who would have benefitted from the payment of interest." *Id.* at 73-74, 981 A.2d at 662. Hodes, however, cannot gain succor from the *Ruddy* case, because Hodes removal of $270,000.00 from the Trust was not with the consent of Ms. Ominsky, nor was it prior to her death, nor was Ms. Ominsky a family member of Hodes, in line with *Ruddy*.

Respondent additionally argues that his taking of the $270,000.00 from the Trust was on terms favorable to the Trust, because the interest rate to be paid was above prime; thus, he argues, no conflict of interest existed. We do not find this argument convincing. In *Whitehead*, 405 Md. at 257, 950 A.2d at 808, we disciplined an attorney who loaned himself $600,000.00 from a conservatorship to purchase property titled in his name and his business partner's name. Whitehead purchased the building as an investment property for himself and his business partner, and secured the $600,000.00 loan with a Note, Mortgage and Assignment of Rents and Leases. Whitehead was not charged with a violation of Rule 1.7, but we concluded that Whitehead's removal of the $600,000.00 was self-dealing and

55

"clearly a misappropriation", because he intentionally removed the money to benefit himself. *Id.* at 257, 950 A.2d at 808.

We reached a similar result in *Sachse*, 345 Md. at 588, 693 A.2d 806 at 811, in dealing with a conflict of interest in a trust situation, when we stated:

> Conflicts of interest impair the trustee's ability to act on behalf of the beneficiaries with independent and disinterested judgment in the administration of the trust, the rationale being that it is generally not possible for the same person to act fairly in two capacities and on behalf of two interests in the same transaction.

*See also Attorney Grievance Comm'n v. Pattison*, 292 Md. 599, 608, 441 A.2d 328, 332 (1982) ("It is fundamental that a fiduciary may not make a loan, secured or unsecured (as was this), unto himself."). When Hodes removed $270,000.00 and $3,500.00 from the Trust Account to benefit himself and his wife, to the detriment of the Trust beneficiaries to whom he owed a duty of loyalty, he violated Rule 1.7.

Respondent additionally excepts to Judge Ballou-Watts's conclusion that he violated Rule 1.15(d). Rule 1.15(d) provides that a lawyer must promptly deliver funds to a client or third party that the client or third party is entitled to receive. Judge Ballou-Watts concluded:

> This Court finds by clear and convincing evidence that Respondent violated Maryland Rule of Professional Conduct 1.15. Under the terms of Gloria Ominsky's Last Will and Testament, the residuary estate was to be held in trust. Respondent, as Trustee, was obligated to distribute the Trust funds to a charitable foundation known as The Ominsky Family Charitable Foundation as directed by the provisions of her will.
> Once the First and Final Administration Account was approved and the estate was closed, Respondent unnecessarily liquidated the UBS investment account funds and deposited those funds into the firm's escrow account. He then opened a checking account at M&T Bank in the name of

56

Gloria S. Ominsky Irrevocable Trust and deposited $375,355.52 into the Trust account. However, instead of promptly delivering the Trust funds to the Foundation, Respondent removed $270,000.00 for his own benefit to facilitate the payment of personal debts. He also removed an additional $3,500.00 for the benefit of a financial consulting company he owned.

Respondent argues that there was no evidence that he violated Rule 1.15(d), because he claims that he was allowed by the terms of Ms. Ominsky's will to loan money to himself.[19] He also argues that his conduct did not violate Rule 1.15(d), because he was not representing a client at the time of his conduct.

Rule 1.15(d) "refers generally to a lawyer's duty to act with the care of a professional fiduciary for any property held by an attorney on behalf of third persons," regardless of if it is in the course of representation. *See Attorney Grievance v. Johnson*, 409 Md. 470, 492, 976 A.2d 245, 258 (2009), quoting *Attorney Grievance v. Clark*, 363 Md. 169, 767 A.2d 865 (2001).[20] We have previously found violations of Rule 1.15(d) when attorneys failed to properly distribute funds to third parties when acting in the role of

---

[19] Ms. Ominsky's Last Will and Testament stated, in relevant part:
ITEM NINE: POWERS OF PERSONAL REPRESENTATIVES AND TRUSTEES.
*** 
(G) Borrow Funds or Make Loans.
    To borrow funds from any party (including my Personal Representatives or the Trustees), or to make loans, for any purpose connected with the administration of the estate or any trust, upon whatever terms, periods of time, and security my Personal Representatives or the Trustees consider advisable.

[20] The order of subsections in Rule 1.15 was changed effective July 1, 2005. Prior to July 1, 2005, Rule 1.15(d) was 1.15(b). In *Attorney Grievance v. Johnson*, 409 Md. at 504, n.1, 976 A.2d at 248, n.1 (2009), we interpreted Rule 1.15(b) as it was prior to recodification but noted that the recodification did not substantively affect the Rule.

57

fiduciaries. *See id.* at 493, 976 A.2d at 258-59 (two attorneys acting as settlement agents both violated Rule 1.15(d), then codified as Rule 1.15(b), for failing to disburse funds to seller of home).

As Judge Ballou-Watts found, Respondent was acting as a Trustee of the Ominsky Trust at the time he withdrew the funds. Regardless of the clause in Ms. Ominsky's will which permitted Respondent to "make loans", Hodes's withdrawals of the $270,000.00 and $3,500.00 were violative of his duty of loyalty to the beneficiaries of the Trust. *See Owrutsky*, 322 Md. at 348-51, 587 A.2d at 518-19 (attorney engaged in misconduct when he withdrew funds as trustee from testamentary trust, because the loan was improper even though there was a clause allowing trustees to make investments). We thus conclude, as did the hearing judge, that Respondent violated Rule 1.15(d).

In a similar vein, Respondent excepts to the hearing judge's conclusion that he violated Section 10-306 of the Business Occupations and Professions Article of the Maryland Code, because, he alleges, he had a duty as trustee to invest the Trust's corpus. Section 10-306 provides: "A lawyer may not use trust money for any purpose other than the purpose for which the trust money is entrusted to the lawyer." To constitute a violation of Section 10-306, "the Court must find that the misappropriation or unauthorized use of the trust funds was knowing and/or intentional." *Jarosinski*, 411 Md. at 445, 983 A.2d at 485.

In *Sachse*, 345 Md. at 590-91, 693 A.2d at 812-13, we upheld the hearing court's conclusion that Sachse, as trustee of a Trust, violated Section 10-306 when he allowed a

client-beneficiary to deplete the Trust's assets by investing in a corporation without securing the transactions or investigating the nature of the transactions. Similarly, in *Whitehead*, 405 Md. at 252, 950 A.2d at 805, we determined Whitehead violated Section 10-306, in his fiduciary role as conservator, in which the "obligation to safeguard the assets of the estate are the same" as a trustee, by utilizing monies entrusted to him to purchase real property titled in his name and that of his business partner.

Respondent willfully and intentionally removed $270,000.00 from the Ominsky Trust account to pay his personal debts and, therefore, violated Section 10-306.

Respondent next excepts to the hearing judge's conclusion that he violated Rule 8.1(a). Rule 8.1(a) prohibits a lawyer from knowingly making a false statement of material fact in a disciplinary matter. Judge Ballou-Watts found that Respondent testified falsely during his Rule 16-732 statement under oath when he claimed that he had executed a personal Guaranty for repayment of the $270,000.00 that he removed from the Trust Account, when in fact, he executed the Guaranty after Bar Counsel's investigation began.

Respondent contends he did not violate Rule 8.1(a), because there was no affirmative evidence offered by Bar Counsel that he testified falsely. In fact, however, as noted above, there was clear and convincing evidence that Hodes did testify falsely regarding his execution of the purported Guaranty. Mr. Adams, Ms. Battaglia and Ms. Zurowski all testified that they had never seen the Guaranty prior to the investigation, had never seen a Guaranty at HPK in that format and had never seen, contrary to Respondent's explanation, Respondent use a cut and paste method to create documents. Respondent,

59

additionally, did not mention the existence of the Guaranty until he gave his Rule 16-732 statement.

Rule 8.1(a) is violated when an attorney knowingly makes a false statement of material fact during a disciplinary proceeding. *Attorney Grievance v. Kapoor*, 391 Md. 505, 894 A.2d 502 (2006) (attorney violated Rule 8.1(a) when he made a false statement of material fact in a statement under oath when he told Bar Counsel that his client never tendered him a $50.00 check, when his client in fact had and he had cashed and spent the check); *Attorney Grievance v. Nussbaum*, 401 Md. 612, 934 A.2d 1 (2007) (attorney violated Rule 8.1(a) when he submitted altered escrow account ledgers to Bar Counsel which he claimed were made contemporaneously with his transactions, when they were not, because the timing of the entries was material to Bar Counsel's investigation); *Harris*, 403 Md. at 164, 939 A.2d at 731 (attorney violated Rule 8.1(a) when he knowingly misrepresented to Bar Counsel in a letter that he titled a Fund to his name when he knew he did not have sole ownership to "hold the account in a 'self-imposed trust'").

We agree with Judge Ballou-Watts "that Respondent knowingly made a false statement about the existence and execution of a personal Guaranty to repay the $270,000.00 during the investigation by Bar Counsel." Several witnesses from Hodes's former firm testified they had never seen the Guaranty, had never seen a Guaranty in that format at HPK and had never seen Hodes use a cut and paste method to create documents. Hodes, additionally, did not mention the Guaranty until the date of his statement under oath on December 12, 2012, well after the investigation had begun. Accordingly, we overrule

Respondent's exception and conclude that Respondent violated Rule 8.1(a) when he testified falsely regarding the Guaranty.

Respondent next challenges the conclusion that his actions constituted a violation of Section 7-113(a) of the Criminal Law Article of the Maryland Code ("Embezzlement - Fraudulent misappropriation by fiduciary."), and, therefore, violated Rule 8.4(b), which prohibits an attorney from engaging in "a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer", because, he alleges, the $270,000.00 was a "loan" to him. Section 7-113(a) provides:

> (a) *Prohibited.* — A fiduciary may not:
> (1) fraudulently and willfully appropriate money or a thing of value that the fiduciary holds in a fiduciary capacity contrary to the requirements of the fiduciary's trust responsibility; or
> (2) secrete money or a thing of value that the fiduciary holds in a fiduciary capacity with a fraudulent intent to use the money or thing of value contrary to the requirements of the fiduciary's trust responsibility.

A criminal charge or conviction is not required in order to violate Rule 8.4(b). *Jarosinski*, 411 Md. at 454, 983 A.2d at 490 ("[T]o conclude that an attorney has violated MRPC 8.4(b), the attorney need not have been convicted of a criminal act; the hearing judge need only find clear and convincing evidence that the attorney committed the underlying offense."). To constitute a Rule 8.4(b) violation, "[a] court must find only clear and convincing evidence of conduct that would violate a criminal statute." *Agbaje*, 438 Md. at 729, 93 A.3d at 282. "The crux of any MRPC 8.4(b) analysis is, as the language of the rule states, whether an attorney's criminal act 'reflects adversely on the lawyer's honesty,

trustworthiness, or fitness as a lawyer in other respects.'" *Attorney Grievance v. Thompson*, 367 Md. 315, 324, 786 A.2d 763, 769 (2001).

Hodes fraudulently and willfully removed money from a Trust he held in a fiduciary capacity as a Trustee, contrary to his responsibilities as a Trustee. Irrespective of the clause in Ms. Ominsky's will which permitted Respondent to "make loans", Hodes's withdrawal of $270,000.00 was violative of his duty of loyalty to the beneficiaries of the Trust. He removed $270,000.00 and used the money to pay off personal debts and, therefore, his actions violated the strictures of Section 7-113(a) and Rule 8.4(b). *See Attorney Grievance v. Prichard*, 386 Md. 238, 247, 872 A.2d 81, 86 (2005) (attorney's conduct constituted a Rule 8.4(b) violation when he engaged in criminal conduct under Section 7-113 by fraudulently and willfully appropriating money he held in a fiduciary capacity).

Respondent also excepts to the hearing judge's conclusion that he violated Rule 8.4(c), which states that it is professional misconduct for an attorney to engage in conduct that involves dishonesty, fraud, deceit or misrepresentation. Specifically, Judge Ballou-Watts determined Hodes violated 8.4(c):

> 1) issuing checks to his wife and his consulting business without following the systems of checks and balances established by the law firm; 2) backdating those checks to make it appear that they were issued before Ms. Ominsky's death; 3) creating an invoice, *post hoc*, for monies his consulting business was not entitled to; and 4) instructing his secretary to backdate the invoice to a date before Ms. Ominsky's death, [which] can only be described as dishonest and fraudulent.

Judge Ballou-Watts found, also, that "Respondent's removal of $270,000.00 from the Ominsky Trust to his business account for Mikelen Gallery, LLC and immediate 'in

branch' transfer of $265,000.00 from the Mikelen account to a joint personal bank account, held with his wife, in order to pay personal debts, was dishonest and fraudulent."

An attorney's conduct constitutes a violation of Rule 8.4(c) when an attorney improperly removes funds and utilizes the money for his or her personal gain. *See Whitehead*, 405 Md. at 257, 950 A.2d at 808 (attorney violated Rule 8.4(c) by misappropriating funds when he intentionally removed $600,000.00 from a conservatorship without court approval and used the funds to purchase real property titled in his name and his business partner's name); *Attorney Grievance v. Vanderlinde*, 364 Md. 376, 773 A.2d 463 (2001) (attorney violated Rule 8.4(c) when she took money from her employer for her own purposes). We have recognized that "self-dealing implicates dishonesty." *Whitehead*, 405 Md. at 259, 950 A.2d at 809.

We agree with Judge Ballou-Watts that Respondent's conduct in issuing unearned checks for $14,500.00 and $775.00 from Ms. Ominsky's personal account for services that had not been rendered and his removal of $270,000.00 and $3,500.00 from the Trust account were acts of dishonesty. Hodes improperly removed funds from both Ms. Ominsky's personal account and the Trust account and utilized those funds for his and his wife's personal benefit. His conduct was dishonest and, thus, violated Rule 8.4(c).

Respondent excepts, thereafter, to the hearing judge's conclusion that he violated Rule 8.4(d), because, he claims, there is no evidence that his conduct interfered with or was prejudicial to the administration of justice. Judge Ballou-Watts determined that Respondent's conduct was prejudicial to the administration of justice and harmful to the

legal profession, "because it undermines the public's confidence that an attorney will exercise his fiduciary duties in protecting funds entrusted to his professional care and responsibility."

We have recognized that, "[c]onduct which is likely to impair public confidence in the profession, impact the image of the legal profession and engender disrespect for the court is conduct prejudicial to the administration of justice." *Agbaje*, 438 Md. at 717, 93 A.3d at 274, citing *Childress*, 360 Md. 373, 758 A.2d 117; *see also Sheinbein*, 372 Md. at 252-53 & n.16, 812 A.2d at 996-97 & n.16 (2002). In *Whitehead*, 405 Md. at 260, 950 A.2d at 810, for example, we concluded Whitehead violated Rule 8.4(d) when he removed $600,000.00 in funds from a conservatorship; we noted "Respondent's self-dealing was harmful to the legal profession because his behavior undermines public confidence that an attorney will maintain entrusted funds as a fiduciary and as required by law."

Hodes, likewise, abused his position as Trustee of the Ominsky Trust and engaged in self-dealing by removing trust funds to pay his personal debts. Such conduct "undermines public confidence that an attorney will maintain entrusted funds as a fiduciary and as required by law." *Id.* at 260, 950 A.2d at 810. Respondent also testified falsely during Bar Counsel's investigation that he executed a Guaranty for the loan at the time he withdrew the money. Hodes's self-dealing and deceitful conduct were prejudicial to the administration of justice in violation of Rule 8.4(d).

Rule 8.4(a) provides that it is professional misconduct for a lawyer to "violate or attempt to violate the Maryland Lawyers' Rules of Professional Conduct". Rule violations,

by themselves, are sufficient to support a violation of Rule 8.4(a). *See Attorney Grievance v. Dominguez*, 427 Md. 308, 47 A.3d 975 (2012). We have determined Hodes violated Rules 1.7, 1.15(d), 8.1(a), 8.4(b), (c) and (d). Respondent, accordingly, has violated Rule 8.4(a).

In summary, we agree with Judge Ballou-Watts that Respondent violated Rules 1.7, 1.15(d), 8.1(a), 8.4(a), (b), (c) and (d), as well as Section 10-306 of the Business Occupations and Professions Article of the Maryland Code.

## IV. Sanction

Respondent has already been disbarred as per our October 6, 2014 *per curiam* order. The bases for Hodes's disbarment are clear.

Initially, it is well settled that the purpose "of attorney discipline is protection of the public, rather than punishment" of the errant attorney. *Attorney Grievance v. Coppola*, 419 Md. 370, 404, 19 A.3d 431, 451 (2011), citing *Attorney Grievance v. Goff*, 399 Md. 1, 30, 922 A.2d 554, 571 (2007). "Imposing a sanction protects the public interest 'because it demonstrates to members of the legal profession the type of conduct which will not be tolerated.'" *Attorney Grievance v. Gallagher*, 371 Md. 673, 714, 810 A.2d 996, 1020, quoting *Mooney*, 359 Md. at 96, 753 A.2d at 38 (citation omitted). We evaluate each attorney grievance matter on its own merits, considering the particular facts and circumstances in order to determine an appropriate sanction. *Coppola*, 419 Md. at 404, 19 A.3d at 451, citing *Attorney Grievance v. Bleecker*, 414 Md. 147, 176, 994 A.2d 928, 945 (2010). We also look to "the presence or absence of mitigating factors and the prior

disciplinary history of the attorney . . . particularly as it reveals the presence or absence of misconduct of the same, or similar, kind to that being addressed." *Attorney Grievance v. McCulloch*, 404 Md. 388, 402, 946 A.2d 1009, 1018 (2008).

We previously have referred to the aggravating factors found in Standard 9.22 of the American Bar Association Standards for Imposing Lawyer Sanctions for guidance when imposing discipline; the factors are:

(a) prior disciplinary offenses;
(b) dishonest or selfish motive;
(c) a pattern of misconduct;
(d) multiple offenses;
(e) bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency;
(f) submission of false evidence, false statements, or other deceptive practices during the disciplinary process;
(g) refusal to acknowledge wrongful nature of conduct;
(h) vulnerability of victim;
(i) substantial experience in the practice of law;
(j) indifference to making restitution;
(k) illegal conduct, including that involving the use of controlled substances.

*Standard 9.22 of the American Bar Association Standards for Imposing Lawyer Sanctions* (1992); *see Bleecker*, 414 Md. at 176-77, 994 A.2d at 945-46 (2010).

Here, aggravating factors (b), (c), (d), (f), (g) and (i) are implicated, because Respondent had embodied a dishonest and selfish motive, engaged in a pattern of misconduct, committed multiple offenses, testified falsely during the grievance investigation and he refused to acknowledge the wrongful nature of his conduct. Hodes had substantial experience in the practice of law, especially in the elder care as well as estates and trusts fields, from which this case evolved.

66

Factor (b), "dishonest or selfish motive", is present here as Respondent had both a dishonest and selfish motive as he removed $270,000.00 and $3,500.00 from the Trust account for his own benefit and the benefit of his financial consulting company and issued unearned checks for $775.00 and $14,500.00 from Ms. Ominsky's personal account for his and his wife's benefit. *See Attorney Grievance v. Penn*, 431 Md. 320, 65 A.3d 125 (2013) (aggravating factor (b) present when attorney engaged in self-dealing transactions). His dishonest motive is borne out by his false testimony before Bar Counsel when he attempted to misdirect the investigation into his wrongful act.

Factor (c), "a pattern of misconduct", is relevant in this case. A pattern of misconduct is formed by a series of acts, even if that series of acts is performed to achieve a single goal. *See Coppola*, 419 Md. at 406, 19 A.3d at 453. Hodes engaged in a pattern of misconduct, including: (1) issuing a $775.00 check to his wife and a $14,500.00 check to his financial consulting business without following HPK's protocol from Ms. Ominsky's personal account, (2) backdating the two checks to make it seem that they were issued prior to Ms. Ominsky's death, (3) creating an invoice after-the-fact for the $14,500.00 his financial consulting business did not earn, (4) directing his secretary to backdate the invoice to a date before Ms. Ominsky's death, (5) issuing a $270,000.00 check from the Ominsky Trust account to his and his wife's art gallery, which he later transferred to their joint personal account, (6) issuing a $3,500.00 check from the Ominsky Trust account to his financial consulting business, (7) failing to execute a Promissory Note for the $270,000.00 and (8) testifying falsely regarding the existence of a Promissory Note

67

Guaranty for the $270,000.00 check. These actions form a clear pattern of misconduct. *See id*.

Factor (d), "multiple offenses", is also implicated. Hodes engaged in multiple offenses when he made four different transactions to benefit himself, right on the heels of Ms. Ominsky's death from cancer, in violation of Rules 1.7, 1.15(d), 8.4(a), (b), (c) and (d). His conduct in removing the funds from Ms. Ominsky's personal account and the Ominsky Trust account and his subsequent ruse during Bar Counsel's investigation in violation of 8.1(a), in an attempt to deceive, implicates multiple offenses. *See Bleecker*, 414 Md. at 177-78, 994 A.2d at 946 (concluding aggravating factor (d) is implicated when a lawyer violates multiple disciplinary rules).

Factor (f), "false statements", is also implicated, because Hodes testified falsely in his Rule 16-732 statement under oath about "the existence and execution of a personal Guaranty to repay the $270,000.00" he improperly removed from the Trust account. *See Dominguez*, 427 Md. at 327, 47 A.3d at 985-86 (attorney's false statement to Bar Counsel implicated aggravating factor (f)).

Factor (g), "refusal to acknowledge wrongful nature of conduct", is also relevant in the instant case. During his Rule 16-732 statement under oath, Hodes refused to acknowledge the wrongful nature of his conduct and claimed that members of the firm reported his activity to Bar Counsel in an effort to "steal" his practice and "make him look like a crook". At the time of the evidentiary hearings, Hodes "complained that he was subjected to a 'star chamber' investigation by his former law firm". Hodes remorselessness

68

further intensifies the nefariousness of his conduct. *See Attorney Grievance v. Mininsohn*, 380 Md. 536, 846 A.2d 353 (2004).

Finally, with respect to factor (i), "substantial experience in the practice of law", Respondent is a veteran attorney, having been admitted to the Bar of this Court on December 18, 1975. The fact that Hodes has spent his career in a practice dominated by work in the elder care, trust and estates and wealth preservation areas is undoubtedly an aggravating factor. *See Coppola*, 419 Md. at 406-07, 19 A.3d 431 at 453 (attorney's experience extensively in the area of estates and trusts since 1996 was an aggravating factor); *see also Whitehead*, 405 Md. at 263, 950 A.2d at 812; *Mininsohn*, 380 Md. at 576, 846 A.2d at 376.

> Mitigating factors, if such exist, that we often consider include:
>
> absence of a prior disciplinary record; absence of a dishonest or selfish motive; personal or emotional problems; timely good faith efforts to make restitution or to rectify consequences of misconduct; full and free disclosure to disciplinary board or cooperative attitude toward proceedings; inexperience in the practice of law; character or reputation; physical or mental disability or impairment; delay in disciplinary proceedings; interim rehabilitation; imposition of other penalties or sanctions; remorse; and finally, remoteness of prior offenses.

*Coppola*, 419 Md. at 407, 19 A.3d at 453 (internal quotations omitted). The hearing judge determined that mitigating factors present in this case included Respondent's lack of a prior disciplinary record; that Respondent repaid the $270,000.00; that "Respondent has been recognized by several organizations for his skill and experience in the practice areas of elder law, estates and trusts and wealth preservation"; that he served as a law professor and discussed elder law issues during weekly radio broadcasts; that he "has been associated

with philanthropic efforts for local institutions"; and that several character witnesses "testified that they trusted him, valued his advice and appreciated his professional service."

The mitigation found by Judge Ballou-Watts, however, does not lessen the seriousness of Hodes's egregious and deceitful conduct. We have recognized that "intentional dishonest conduct is closely entwined with the most important matters of basic character to such a degree as to make intentional dishonest conduct by a lawyer almost beyond excuse." *Vanderlinde*, 364 Md. at 418, 773 A.2d at 488; *see Seltzer*, 424 Md. at 118, 34 A.3d at 512-13 (disbarring attorney for issuing bad checks, providing fraudulent documents, and withdrawing funds from his realty company's escrow account); *Johnson*, 409 Md. at 508, 976 A.2d at 267 (disbarring two attorneys for their involvement in a "fraudulent, equity-stripping transaction" with home-owners); *Lazerow*, 320 Md. at 515-16, 578 A.2d at 783 (disbarring non-practicing attorney who misappropriated home purchasers' payments out of escrow accounts). Clearly, Hodes engaged in self-dealing, as well as deceitful and duplicitous acts, designed to benefit himself and his wife and to shield him from discipline. Disbarment is the only appropriate sanction.

Hodes, however, identifies various cases in which we did not disbar as examples of the sanction we should have imposed upon him. Two of the cases involved negligence, however: *Attorney Grievance v. Tun*, 428 Md. 235, 51 A.3d 565 (2012) (suspension appropriate when respondent negligently, but not intentionally, overbilled the District of Columbia Superior Court for legal services rendered to indigent defendants in criminal cases) and *Attorney Grievance v. Zuckerman*, 386 Md. 341, 872 A.2d 693 (2005)

70

(suspension appropriate when misappropriation of funds was caused by respondent's ineffectual accounting procedures and the respondent's employee's theft).

The remainder of the cases cited by Hodes are no longer part of our modern attorney discipline jurisprudence,[21] because, as we noted in *Vanderlinde*, 364 Md. at 418, 773 A.2d at 488:

> With our opinion today, we impress upon the members of the bar that the Court does not consider *Hess* or the pre-*Kenney* cases to be authority for an argument for leniency in attorney disciplinary matters involving intentionally dishonest conduct.

We therefore conclude that Respondent's cases, decided prior to our rule adopted in *Vanderlinde* that intentionally dishonest conduct normally results in disbarment, absent compelling circumstances, are inapplicable.

Hodes issued two unearned checks from Ms. Ominsky's personal account, one for $775.00 to his wife, and one for $14,500.00 to his financial consulting company, merely a day after Ms. Ominsky's death from cancer, to benefit himself and his wife. He backdated the checks to make it appear as though he issued them during her lifetime. He then directed his secretary to create and backdate an invoice from his financial consulting company to Ms. Ominsky, after-the-fact, in attempt to legitimize the $14,500.00 check. After Ms. Ominsky's death, as directed in her will, he became Trustee of the Ominsky Trust, a testamentary trust intended to be disbursed into the Ominsky Family Charitable Foundation

---

[21] Respondent cited *Attorney Grievance v. Hess*, 352 Md. 438, 722 A.2d 905 (1999); *Attorney Grievance Comm'n v. Bakas*, 323 Md. 395, 593 A.2d 1087 (1991); *Attorney Grievance Comm'n v. Singleton*, 311 Md. 1, 532 A.2d 157 (1987); *Prince George's County Bar Ass'n v. Vance,* 273 Md. 79, 327 A.2d 767 (1974).

71

from which he perversely funnelled funds directed to the Charitable Foundation by fraudulently and willfully removing $270,000.00 and $3,500.00 to benefit himself and his wife. He continued his subterfuge by testifying falsely during his Rule 16-732 statement under oath in an attempt to camouflage his fraudulent behavior.

Hodes's conduct was intentionally dishonest, fraudulent and demonstrative of a lack of the fundamental qualities of a lawyer: honesty, integrity and respect for the legal system. *See Milliken*, 348 Md. at 520, 704 A.2d at 1241. He continues to fail to appreciate the wrongfulness of his conduct. We cannot and will not condone such behavior.

Accordingly, we entered the October 6, 2014, *per curiam* order, disbarring Michael Carl Hodes.